SECURITIES AND EXCHANGE COMMISSION *v.* CHENERY CORPORATION ET AL.

No. 254.   Argued December 17, 18, 1942.—Decided February 1, 1943.

*Mr. Chester T. Lane,* with whom *Solicitor General Fahy* and *Messrs. Richard S. Salant, John F. Davis, Homer Kripke,* and *Theodore L. Thau* were on the brief, for petitioner.

*Mr. Spencer Gordon* for respondents.

*Mr. Allen S. Hubbard* was on a brief for the Federal Water and Gas Corporation, respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The respondents, who were officers, directors, and controlling stockholders of the Federal Water Service Corporation (hereafter called Federal), a holding company registered under the Public Utility Holding Company Act of 1935, c. 687, 49 Stat. 803, 15 U. S. C. § 79, brought this proceeding under § 24(a) of the Act to review an order made by the Securities and Exchange Commission on September 24, 1941, approving a plan of reorganization for the company. Under the Commission's order, preferred stock acquired by the respondents during the period in which successive reorganization plans proposed by the management of the company were before the Commission, was not permitted to participate in the reorganization on an equal footing with all other preferred stock. The Court of Appeals for the District of Columbia, with one judge dissenting, set the Commission's order aside, 128 F. 2d 303, and because the question presented looms large in the administration of the Act, we brought the case here.

The relevant facts are as follows. In 1937, Federal was a typical public utility holding company. Incorporated in Delaware, its assets consisted of securities of subsidiary water, gas, electric, and other companies in thirteen states and one foreign country. The respondents controlled Federal through their control of its parent, Utility Operators Company, which owned all of the outstanding shares of Federal's Class B common stock, representing the controlling voting power in the company. On November 8, 1937, when Federal registered as a holding company under the Public Utility Holding Company Act of 1935, its management filed a plan for reorganization under §§ 7 and 11 of the Act, the relevant portions of which are copied in the margin.[1] This plan, as well as two other plans later

---

[1] "SEC. 7. (a) A registered holding company or subsidiary company thereof may file a declaration with the Commission, regarding any of the acts enumerated in subsection (a) of section 6, in such form as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers. Such declaration shall include—

"(1) such of the information and documents which are required to be filed in order to register a security under section 7 of the Securities Act of 1933, as amended, as the Commission may by rules and regulations or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers; and

"(2) such additional information, in such form and detail, and such documents regarding the declarant or any associate company thereof, the particular security and compliance with such State laws as may apply to the act in question as the Commission may by rules and regulations or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers. . . .

"(d) If the requirements of subsections (c) and (g) are satisfied, the Commission shall permit a declaration regarding the issue or sale of a security to become effective unless the Commission finds that—

.     .     .     .     .     .

"(6) the terms and conditions of the issue or sale of the security are detrimental to the public interest or the interest of investors or consumers.

"(e) If the requirements of subsection (g) are satisfied, the Commission shall permit a declaration to become effective regarding the exercise

submitted by Federal, provided for participation by Class B stockholders in the equity of the proposed reorganized company. This feature of the plans was unacceptable to the Commission, and all were ultimately withdrawn.

of a privilege or right to alter the priorities, preferences, voting power, or other rights of the holders of an outstanding security unless the Commission finds that such exercise of such privilege or right will result in an unfair or inequitable distribution of voting power among holders of the securities of the declarant or is otherwise detrimental to the public interest or the interest of investors or consumers.

"(f) Any order permitting a declaration to become effective may contain such terms and conditions as the Commission finds necessary to assure compliance with the conditions specified in this section. . . .

"SEC. 11. (a) It shall be the duty of the Commission to examine the corporate structure of every registered holding company and subsidiary company thereof, the relationships among the companies in the holding-company system of every such company and the character of the interests thereof and the properties owned or controlled thereby to determine the extent to which the corporate structure of such holding-company system and the companies therein may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public-utility system. . . .

"(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. If, upon

On March 30, 1940, a fourth plan was filed by Federal. This plan, proposing a merger of Federal, Utility Operators Company, and Federal Water and Gas Corporation, a wholly-owned inactive subsidiary of Federal, contained no provision for participation by the Class B stock. Instead, that class of stock was to be surrendered for cancellation, and the preferred and Class A common stock of Federal were to be converted into common stock of the new corporation. As the Commission pointed out in its analysis of the proposed plan, "except for the 5.3% of new common allocated to the present holders of Class A stock, substantially all of the equity of the reorganized company will be given to the present preferred stockholders."

During the period from November 8, 1937, to June 30, 1940, while the successive reorganization plans were before the Commission, the respondents purchased a total of 12,407 shares of Federal's preferred stock. (The total number of outstanding shares of Federal's preferred stock was 159,269.) These purchases were made on the over-the-counter market through brokers at prices lower than the book value of the common stock of the new corporation into which the preferred stock would have been converted under the proposed plan. If this feature of the plan had been approved by the Commission, the respondents through their holdings of Federal's preferred stock would

---

any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed. . . ."

have acquired more than 10 per cent of the common stock of the new corporation. The respondents frankly admitted that their purpose in buying the preferred stock was to protect their interests in the company.

In ascertaining whether the terms of issuance of the new common stock were "fair and equitable" or "detrimental to the interests of investors" within § 7 of the Act, the Commission found that it could not approve the proposed plan so long as the preferred stock acquired by the respondents would be permitted to share on a parity with other preferred stock. The Commission did not find fraud or lack of disclosure, but it concluded that the respondents, as Federal's managers, were fiduciaries and hence under a "duty of fair dealing" not to trade in the securities of the corporation while plans for its reorganization were before the Commission. It recommended that a formula be devised under which the respondents' preferred stock would participate only to the extent of the purchase prices paid plus accumulated dividends since the dates of such purchases. Accordingly, the plan was thereafter amended to provide that the preferred stock acquired by the respondents, unlike the preferred stock held by others, would not be converted into stock of the reorganized company, but could only be surrendered at cost plus 4 per cent interest. The Commission, over the respondents' objections, approved the plan as thus amended, and it is this order which is now under review.

We completely agree with the Commission that officers and directors who manage a holding company in process of reorganization under the Public Utility Holding Company Act of 1935 occupy positions of trust. We reject a lax view of fiduciary obligations and insist upon their scrupulous observance. See *Wormley* v. *Wormley*, 8 Wheat. 421, 441; *Southern Pacific Co.* v. *Bogert*, 250 U. S. 483, 487–88; and see Stone, *The Public Influence of the Bar*, 48 Harv. L. Rev. 1, 8–9. But to say that a man is a fidu-

ciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

The Commission did not find that the respondents as managers of Federal acted covertly or traded on inside knowledge, or that their position as reorganization managers enabled them to purchase the preferred stock at prices lower than they would otherwise have had to pay, or that their acquisition of the stock in any way prejudiced the interests of the corporation or its stockholders. To be sure, the new stock into which the respondents' preferred stock would be converted under the plan of reorganization would have a book value—which may or may not represent market value—considerably greater than the prices paid for the preferred stock. But that would equally be true of purchases of preferred stock made by other investors. The respondents, the Commission tells us, acquired their stock as the outside world did, and upon no better terms. The Commission dealt with this as a specific case, and not as the application of a general rule formulating rules of conduct for reorganization managers. Consequently, it is a vital consideration that the Commission conceded that the respondents did not acquire their stock through any favoring circumstances. In its own words, "honesty, full disclosure, and purchase at a fair price" characterized the transactions. The Commission did not suggest that, as a result of their purchases of preferred stock, the respondents would be unjustly enriched. On the contrary, the question before the Commission was whether the respondents, simply because they were reorganization managers, should be denied the benefits to be received by the 6,000 other preferred stockholders. Some technical rule of law must have moved the Commission to single out the respondents and deny their preferred

stock the right to participate equally in the reorganization. To ascertain the precise basis of its determination, we must look to the Commission's opinion.

The Commission stated that "in the process of formulation of a 'voluntary' reorganization plan, the management of a corporation occupies a fiduciary position toward all of the security holders to be affected, and that it is subjected to the same standards as other fiduciaries with respect to dealing with the property which is the subject matter of the trust." Applying by analogy the restrictions imposed on trustees in trafficking in property held by them in trust for others, *Michoud* v. *Girod,* 4 How. 503, 557, the Commission ruled that even though the management does not hold the stock of the corporation in trust for the stockholders, nevertheless the "duty of fair dealing" which the management owes to the stockholders is violated if those in control of the corporation purchase its stock, even at a fair price, openly and without fraud. The Commission concluded that "honesty, full disclosure, and purchase at a fair price do not take the case outside the rule."

In reaching this result the Commission stated that it was merely applying "the broad equitable principles enunciated in the cases heretofore cited," namely, *Pepper* v. *Litton,* 308 U. S. 295; *Michoud* v. *Girod,* 4 How. 503, 557; *Magruder* v. *Drury,* 235 U. S. 106, 119–20, and *Meinhard* v. *Salmon,* 249 N. Y. 458, 164 N. E. 545. Its opinion plainly shows that the Commission purported to be acting only as it assumed a court of equity would have acted in a similar case. Since the decision of the Commission was explicitly based upon the applicability of principles of equity announced by courts, its validity must likewise be judged on that basis. The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.

In confining our review to a judgment upon the validity of the grounds upon which the Commission itself based its action, we do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct "although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering* v. *Gowran*, 302 U. S. 238, 245. The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate. But it is also familiar appellate procedure that where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury. Like considerations govern review of administrative orders. If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.

If, therefore, the rule applied by the Commission is to be judged solely on the basis of its adherence to principles of equity derived from judicial decisions, its order plainly cannot stand. As the Commission concedes here, the courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock.[2]

[2] See 1 Dodd and Baker, Cases on Business Associations (1940) 498–500, 583–86, 621–22; 1 Morawetz on Private Corporations (2d ed. 1886) §§ 516–21, pp. 482–89.

The cases upon which the Commission relied do not establish principles of law and equity which in themselves are sufficient to sustain its order. The only question in *Pepper* v. *Litton,* 308 U. S. 295, was whether claims obtained by the controlling stockholders of a bankrupt corporation were to be treated equally with the claims of other creditors where the evidence revealed "a scheme to defraud creditors reminiscent of some of the evils with which 13 Eliz. c. 5 was designed to cope," 308 U. S. at 296. Another case relied upon, *Woods* v. *City Bank Co.,* 312 U. S. 262, held only that a bankruptcy court, in the exercise of its plenary power to review fees and expenses in connection with a reorganization proceeding under Chapter X of the Chandler Act, 52 Stat. 840, could deny compensation to protective committees representing conflicting interests. *Michoud* v. *Girod,* 4 How. 503, and *Magruder* v. *Drury,* 235 U. S. 106, dealt with the specific obligations of express trustees and not with those of persons in control of a corporate enterprise toward its stockholders.

Determination of what is "fair and equitable" calls for the application of ethical standards to particular sets of facts. But these standards are not static. In evolving standards of fairness and equity, the Commission is not bound by settled judicial precedents. Congress certainly did not mean to preclude the formulation by the Commission of standards expressing a more sensitive regard for what is right and what is wrong than those prevalent at the time the Public Utility Holding Company Act of 1935 became law. But the Commission did not in this case proffer new standards reflecting the experience gained by it in effectuating the legislative policy. On the contrary, it explicitly disavowed any purpose of going beyond those which the courts had theretofore recognized. Since the Commission professed to decide the case before it according to settled judicial doctrines, its action must be judged by the standards which the Commission itself invoked.

And judged by those standards, *i. e.*, those which would be enforced by a court of equity, we must conclude that the Commission was in error in deeming its action controlled by established judicial principles.

But the Commission urges here that the order should nevertheless be sustained because "the effect of trading by management is not measured by the fairness of individual transactions between buyer and seller, but by its relation to the timing and dynamics of the reorganization which the management itself initiates and so largely controls." Its argument lays stress upon the "strategic position enjoyed by the management in this type of reorganization proceeding and the vesting in it of statutory powers available to no other representative of security holders." It contends that these considerations warrant the stern rule applied in this case since the Commission "has dealt extensively with corporate reorganizations, both under the Act, and other statutes entrusted to it," and "has, in addition, exhaustively studied protective and reorganization committees," and that the situation was therefore "peculiarly within the Commission's special administrative competence."

In determining whether to approve the plan of reorganization proposed by Federal's management, the Commission could inquire, under § 7 (d) (6) and (e) of the Act, whether the proposal was "detrimental to the public interest or the interest of investors or consumers," and, under § 11 (e), whether it was "fair and equitable." That these provisions were meant to confer upon the Commission broad powers for the protection of the public plainly appears from the reports of the Congressional committees in charge of the legislation. The provisions of § 7 were "designed to give adequate protection to investors and consumers . . . and are in accord with the underlying purpose of the legislation to give to investors and consumers full protection against the deleterious practices

which have characterized certain holding-company finance in the past." Sen. Rep. No. 621, 74th Cong., 1st Sess., p. 28. Similarly, the authority given the Commission by § 11 was intended to be responsive to the demands of the particular situations with which the Commission would be faced: "Under these subsections [11 (d), (e), and (f)], Commission approval of reorganization plans and supervision of the conditions under which such plans are prepared will make it impossible for a group of favored insiders to continue their domination over inarticulate and helpless minorities, or even as is often the case, majorities . . ." *Id.*, p. 33.

In view of this legislative history, reflecting the range of public interests committed to the care of the Commission, § 17 (a) and (b), which requires officers and directors of any holding company registered under the Act to file statements of their security holdings in the company and provides that profits made from dealing in such securities within any period of less than six months shall inure to the benefit of the company, cannot be regarded as a limitation upon the power of the Commission to deal with other situations in which officers and directors have failed to measure up to the standards of conduct imposed upon them by the Act. The Act vests in the officers and directors of a holding company registered under the Act broad powers as representatives of all the stockholders. Besides the Commission, only the management can initiate a proceeding before the Commission to simplify the corporate structure and to effect a fair and equitable distribution of voting power among security holders. Only the management can amend a plan under §§ 7 and 11 (e), and this it may do at any time; only the management can withdraw the plan, and this too it may do at will; and even after the Commission has approved a plan, it cannot be carried out without the consent of the management.

Notwithstanding § 17 (a) and (b), therefore, the Commission could take appropriate action for the correction of reorganization abuses found to be "detrimental to the public interest or the interest of investors or consumers." It was entitled to take into account those more subtle factors in the marketing of utility company securities that gave rise to the very grave evils which the Public Utility Holding Act of 1935 was designed to correct. See the concurring opinion of Judge Learned Hand in *Morgan Stanley & Co.* v. *Securities & Exchange Commission,* 126 F. 2d 325, 332.

But the difficulty remains that the considerations urged here in support of the Commission's order were not those upon which its action was based. The Commission did not rely upon "its special administrative competence"; it formulated no judgment upon the requirements of the "public interest or the interest of investors or consumers" in the situation before it. Through its preoccupation with the special problems of utility reorganizations the Commission accumulates an experience and insight denied to others. Had the Commission, acting upon its experience and peculiar competence, promulgated a general rule of which its order here was a particular application, the problem for our consideration would be very different. Whether and to what extent directors or officers should be prohibited from buying or selling stock of the corporation during its reorganization, presents problems of policy for the judgment of Congress or of the body to which it has delegated power to deal with the matter. Abuse of corporate position, influence, and access to information may raise questions so subtle that the law can deal with them effectively only by prohibitions not concerned with the fairness of a particular transaction. But before transactions otherwise legal can be outlawed or denied their usual business consequences, they must fall under the ban of some standards of conduct prescribed by an agency of

government authorized to prescribe such standards— either the courts or Congress or an agency to which Congress has delegated its authority. Congress itself did not proscribe the respondents' purchases of preferred stock in Federal. Established judicial doctrines do not condemn these transactions. Nor has the Commission, acting under the rule-making powers delegated to it by § 11(e), promulgated new general standards of conduct. It purported merely to be applying an existing judge-made rule of equity. The Commission's determination can stand, therefore, only if it found that the specific transactions under scrutiny showed misuse by the respondents of their position as reorganization managers, in that as such managers they took advantage of the corporation or the other stockholders or the investing public. The record is utterly barren of any such showing. Indeed, such a claim against the respondents was explicitly disavowed by the Commission.

In view of the conditions imposed by the Commission in approving the plan, it is clear that the respondents were charged with violation of a positive command of law rather than with any moral wrong. If there has been a wrong, it would be against the stockholders from whom they purchased the preferred stock at less than the book value of the new stock—which, as we have already said, may or may not be its real value. But the Commission did not regard such stockholders as beneficiaries of the respondents' "trust" and hence entitled to restitution. The Commission did not undo the purchases deemed by it to have been made by the respondents in violation of their fiduciary obligations. Instead, the Commission confirmed the purchases and ordered that the stock be surrendered to the corporation.

Judged, therefore, as a determination based upon judge-made rules of equity, the Commission's order cannot be upheld. Its action must be measured by what the Com-

mission did, not by what it might have done. It is not for us to determine independently what is "detrimental to the public interest or the interest of investors or consumers" or "fair or equitable" within the meaning of §§ 7 and 11 of the Public Utility Holding Company Act of 1935. The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding. Compare *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 510–11. There is no such finding here.

Congress has seen fit to subject to judicial review such orders of the Securities and Exchange Commission as the one before us. That the scope of such review is narrowly circumscribed is beside the point. For the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. If the action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law. In either event the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained. "The administrative process will best be vindicated by clarity in its exercise." *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, 197. What was said in that case is equally applicable here: "We do not intend to enter the province that belongs to the Board, nor do we do so. All we ask of the Board is to give clear indication that it has exercised the discretion with

which Congress has empowered it. This is to affirm most emphatically the authority of the Board." *Ibid.* Compare *United States* v. *Carolina Carriers Corp.*, 315 U. S. 475, 488–90. In finding that the Commission's order cannot be sustained, we are not imposing any trammels on its powers. We are not enforcing formal requirements. We are not suggesting that the Commission must justify its exercise of administrative discretion in any particular manner or with artistic refinement. We are not sticking in the bark of words. We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.

The cause should therefore be remanded to the Court of Appeals with directions to remand to the Commission for such further proceedings, not inconsistent with this opinion, as may be appropriate.

*So ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration and decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE REED and MR. JUSTICE MURPHY concur, dissenting.

For reasons set out in the Court's opinion and the dissenting opinion below, I agree that these respondents, officers and directors of the Corporations seeking reorganization, acted in a fiduciary capacity in formulating and managing plans they submitted to the Commission, and that, as fiduciaries, they should be held to a scrupulous observance of their trust. I further agree that Congress conferred on the Commission "broad powers for the protection of the public," investors and consumers; and that the Commission, not the Court, was invested by Congress with authority to determine whether a proposed reorganization or merger would be "fair and equitable," or whether

it would be "detrimental to the public interest or the interest of investors or consumers."

The conclusions of the Court with which I disagree are those in which it holds that while the Securities and Exchange Commission has abundant power to meet the situation presented by the activities of these respondents, it has not done so. This conclusion is apparently based on the premise that the Commission has relied upon the common law rather than on "new standards reflecting the experience gained by it in effectuating legislative policy," and that the common law does not support its conclusion; that the Commission could have promulgated "a general rule of which its order here was a particular application," but instead made merely an ad hoc judgment; and that the Commission made no finding that these practices would prejudice anyone.

The Commission's actual finding was that "The plan of reorganization herein considered, like the previous plans filed with us over the past several years, was formulated by the management of Federal, and discussions concerning the reorganization of this corporation have taken place between the management and the staff of the Commission over the past several years;" that C. T. Chenery purchased 8,618 shares of preferred stock during this period; that other officers and directors of the concerns involved acquired 3,789 shares during the same period; that for this stock these respondent fiduciaries paid $328,346.89 and then submitted their latest reorganization plan, under which this purchased stock would have a book value in the reorganization company of $1,162,431.90. In the light of these and other facts the Commission concluded that the new plan would be "unfair, inequitable, and detrimental, so long as the preferred stock purchased by the management at low prices is to be permitted to share on a parity with other preferred stock." The Commission declined to give "effectiveness" to the proposed plan and entered

"adverse findings" against it under §§ 7(d)(1) and 7(d)(2) of the controlling Act, resting its refusal to approve on this statement: "We find that the provisions for participation by the preferred stock held by the management result in the terms of issuance of the new securities being detrimental to the interests of investors and the plan being unfair and inequitable."

The grounds upon which the Commission made its findings seem clear enough to me. Accepting, as the Court does, the fiduciary relationship of these respondents in managing the Commission proceedings, it follows that their peculiar information as to the stock values under their proposed plan afforded them opportunities for stock purchase profits which other stockholders did not have. While such fiduciaries, they bought preferred stock and then offered a reorganization plan which would give this stock a book value of four times the price they had paid for it. What the Commission has done is to say that no such reward shall be reaped by these fiduciaries. At the same time they are permitted to recover the full purchase price with interest. To permit their reorganization plan to put them in the same position as the old stockholders gives to these fiduciaries an unconscionable profit for trading with inside information.

I can see nothing improper in the Commission's findings and determinations. On the contrary, the rule they evolved appears to me to be a salutary one, adequately supported by cogent reasons and thoroughly consistent with the high standards of conduct which should be required of fiduciaries. That the Commission saw fit to draw support for its own administrative conclusion from decisions of courts should not detract from the validity of its findings. Entrusted as the Commission is with the responsibility of lifting the standard of transactions in the market place in order that the managers of financial ventures may not impose upon the general investing pub-

lic, it seems wholly appropriate that the Commission should have recognized the influence of admonitory language like the following it approvingly quoted from *Meinhard* v. *Salmon*, 249 N. Y. 458, 164 N. E. 545:

"A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

The decisions cited by the Commission seem to me to show the soundness of the conclusion it reached. As judges we are entitled to a sense of gratification that the common law has been able to make so substantial a contribution to the development of the administrative law of this field. See e. g. *Pepper* v. *Litton*, 308 U. S. 295; *Michoud* v. *Girod*, 4 How. 503; *Magruder* v. *Drury*, 235 U. S. 106. Of course the Commission is not limited to common law principles in protecting investors and the public, but even if it were so limited the *Magruder* case would in my opinion provide complete support for the position taken by the Commission: "The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity. . . . It makes no difference that the estate was not a loser in the transaction or that the commission was no more than the services were reasonably worth." pp. 119, 120. The distinction now seen by the Court between these cases and the instant problem comes to little more than that the fact situations are similar but not identical.

While I consider that the cases on which the Commission relied give full support to the conclusion it reached, I do not suppose, as the Court does, that the Commission's rule is not fully based on Commission experience. The

Commission did not "explicitly disavow" any reliance on what its members had learned in their years of experience, and of course they, as trade experts, made their findings that respondent's practice was "detrimental to the interests of investors" in the light of their knowledge. That they did not unduly parade fact data across the pages of their reports is a commendable saving of effort since they meant merely to announce for their own jurisdiction an obvious rule of honest dealing closely related to common law standards. Of course, the Commission can now change the form of its decision to comply with the Court order. The Court can require the Commission to use more words; but it seems difficult to imagine how more words or different words could further illuminate its purpose or its determination. A judicial requirement of circumstantially detailed findings as the price of court approval can bog the administrative power in a quagmire of minutiae. Hypercritical exactions as to findings can provide a handy but an almost invisible glideway enabling courts to pass "from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. Here for instance, the Court apparently holds that the Commission has full power to do exactly what it did; but the Court sends the matter back to the Commission to revise the language of its opinion, in order, I suppose, that the Court may reappraise the reasons which moved the Commission to determine that the conduct of these fiduciaries was detrimental to the public and investors. The Act under which the Commission proceeded does not purport to vest us with authority to make such a reappraisal.

That the Commission has chosen to proceed case by case rather than by a general pronouncement does not appear to me to merit criticism. The intimation is that the Commission can act only through general formulae rigidly adhered to. In the first place, the rule of the single case is obviously a general advertisement to the trade,

and in the second place the briefs before us indicate that this is but one of a number of cases in which the Commission is moving to an identical result on a broad front. But aside from these considerations the Act gives the Commission wide powers to evolve policy standards, and this may well be done case by case, as under the Federal Trade Commission Act. *Federal Trade Commission* v. *Keppel & Bro.*, 291 U. S. 304, 310–312.

The whole point of the Commission finding has been lost if it is criticized for a failure to show injury to particular shareholders. The Commission holding is that it should not "undertake to decide case by case whether the management's trading has in fact operated to the detriment of the persons whom it represents," because the "tendency to evil" from this practice is so great that the Commission desires to attach to it a conclusive presumption of impropriety.

The rule the Commission adopted here is appropriate. Protection of investors from insiders was one of the chief reasons which led to adoption of the law which the Commission was selected to administer.[1] That purpose can be greatly retarded by overmeticulous exactions, exactions which require a detailed narration of underlying reasons which prompt the Commission to require high standards of honesty and fairness. I favor approving the rule they applied.

---

[1] "Among the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their market activities. Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others." Report of the Senate Committee on Banking and Currency on Stock Exchange Practices, Report No. 1455, 73d Cong., 2d Sess., p. 55.