826 F.2d 1129
 264 U.S.App.D.C. 113
 RESERVATION TELEPHONE COOPERATIVE, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
General Telephone Company, American Telephone and Telegraph
Co., Bell Atlantic Telephone Companies,
Northwestern Bell Telephone Company, Intervenors.
 No. 85-1822.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 3, 1987.
Decided Aug. 25, 1987.
 
 Petition for Review of an Order of the Federal Communications commission.
 David Cosson, with whom Paul G. Daniel, Washington, D.C., was on the brief for petitioners.
 
 
 1
 Linda L. Oliver, Counsel, F.C.C., Washington, D.C., for respondent. Jack D. Smith, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle and Laurel R. Bergold, Counsel, F.C.C., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., were on the brief for respondents. George Edelstein, Atty., Dept. of Justice, and Jane E. Mago, Counsel, F.C.C., Washington, D.C., also entered appearances.
 
 
 2
 Jules M. Perlberg, with whom C. John Buresh, Jonathan S. Hoak, Chicago, Ill., and Robert B. Stechert, Basking Ridge, N.J., were on the brief for intervenor, AT & T. Judith A. Maynes, New Haven, Conn., also entered an appearance.
 
 
 3
 William Malone and James R. Hobson, Washington, D.C., were on the brief for intervenor, General Telephone Co.
 
 
 4
 Dana A. Rasmussen and Robert B. McKenna, Washington, D.C., were on the brief for intervenor, Northwestern Bell Telephone Co.
 
 
 5
 David K. Hall, Washington, D.C., entered an appearance for intervenors, Bell Atlantic Telephone Companies.
 
 
 6
 Before MIKVA, BORK and BUCKLEY, Circuit Judges.
 
 
 7
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 8
 This case presents a financial dispute that turns on the proper interpretation of a settlement contract whose language is patterned after rules established by the Federal Communications Commission. The Commission issued an order resolving the dispute, and the complaining parties now petition for review. We deny the petition for review.
 
 I.
 
 9
 A typical long-distance telephone call originates at a local facility, proceeds through an interstate service, and terminates at another local facility. The local facilities involved at each end thus contribute to interstate service at the same time that they also provide purely local and intrastate service. The dispute in this case involves the allocation between the interstate and intrastate markets of the costs of using those local facilities.
 
 
 10
 Petitioners are small, independent telephone companies and cooperatives that provide telephone service to subscribers in rural areas of North and South Dakota. At the time of this dispute, which preceded the break-up of the American Telephone & Telegraph Company, petitioners provided their customers with purely local service and with local origination and termination facilities for AT & T's long-distance service. Under the usual arrangement for handling the business receipts of long-distance calls, the local company at the originating end of a long-distance call would collect payment from customers for the calls. These payments were then divided between petitioners and AT & T. Petitioners received amounts that covered their costs of providing the origination and termination service, plus a fixed return, and AT & T received the remaining amount.
 
 
 11
 At issue here is the method that was used to establish the portion of petitioners' costs that were incurred through their participation in the interstate market. That method was established in individual settlement contracts between petitioners and AT & T. See, e.g., GTE Serv. Corp. v. FCC, 782 F.2d 263, 271 (D.C.Cir.1986). In those contracts, petitioners and AT & T agreed to compute petitioners' costs in accordance with the procedures set out in the Commission's rules on the subject.[1] Petitioners argue that their agreements (and thus the Commission's rules) have been wrongly interpreted, that more of their costs should have been attributed to their participation in the interstate market, and that consequently they should have received more money from AT & T to cover those costs than they actually did.
 
 
 12
 For almost forty years, the Commission's approach to allocating the costs of local facilities between the interstate and intrastate markets has been set out in its Separations Manual.[2] It is important to note that the provisions in the Manual do not directly control the allocation of costs in any private contracts between local telephone companies and long-distance carriers, though quite often, as in this case, the contracting parties defer on this issue to the Manual. These provisions were adopted, instead, with a very different purpose in view--to determine the boundaries of the power exercised by the Commission, on the one hand, and by state and local regulatory bodies, on the other. The Commission is empowered to regulate telephone services only in the interstate market; the state and local bodies regulate the intrastate market. Just as private contracts are necessary to allocate the costs of local facilities between the interstate and intrastate markets in order to determine revenues, the Manual is necessary to allocate the costs of local facilities between the interstate and intrastate markets in order to determine jurisdiction. The political sensitivity of this jurisdictional determination is widely recognized, and indeed in 1971 Congress enacted a requirement that the Commission must refer any proposed rulemaking proceeding "regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations" to a Joint Board of federal and state officials for their review and recommendations before the Commission may act on the proposal. 47 U.S.C. Sec. 410(c) (1982).[3] This provision endorsed the procedures the Commission had used in amending the Separations Manual the previous year. See In re Separation Procedures, 26 F.C.C.2d 247 (1970).
 
 
 13
 The disputed language from the Manual states that allocation of costs between the interstate and intrastate markets is to be based on "measurements of use" made in "studies of traffic handled or work performed during a representative period," which are then "applied to overall traffic volumes." FCC Separations Manual p 11.212 (1971 ed.). For many years, petitioners and AT & T had followed the predominant practice in the communications industry by basing their allocation of costs on studies of traffic handled over a period of five business days, which was generally acknowledged to be "a representative period." By the late 1970s, however, petitioners had come to believe that the different patterns of long-distance telephone use between weekend days and business week days made the five-day period unrepresentative, and that use of a seven-day period would be more to their advantage. They tried to persuade AT & T to accept studies based on the seven-day period in place of studies based on the five-day period, but AT & T refused.
 
 
 14
 In February of 1981, petitioners filed a complaint with the Commission, charging that AT & T had committed various violations of the Communications Act, contending that the five-day period was no longer representative of the patterns of interstate use of their facilities, and asking the Commission to rule that the term "a representative period" required the use of a seven-day period. After a considerable lapse of time, the Commission issued an order denying relief. The Commission noted that the relevant language in the Manual had never been understood to require the use of a seven-day period. The Commission also explained that the provisions in the 1971 edition of the Separations Manual had been worked out amidst a general expectation that jurisdictional determinations would be based on the procedures in effect at the time those provisions were approved, and that no significant changes would be made without further consultation and approval by the federal and state regulatory bodies that would be directly affected by any such changes. The Commission thus construed the term "a representative period" to mean the particular period that an individual carrier had been using when the latest version of the Manual had taken effect (here the 1971 edition). See Reservation Tel. Coop., F.C.C. No. 85-632, p 28 (Dec. 5, 1985). Moreover, the Commission pointed out that it had recently amended this language, in consultation with the Joint Board, to require the use of studies based on a seven-day period by adding that hereafter studies would be based on "a representative period for all traffic." See In re Amendment of Part 67 of the Commission's Rules, 96 F.C.C.2d 781, 809 (1984) (emphasis added). This amendment would have been completely unnecessary if the Manual had already required use of a seven-day period.
 
 
 15
 Finally, the Commission also denied a second claim for relief, in which petitioners alleged that AT & T had unjustly and unreasonably discriminated against them, in violation of 47 U.S.C. Sec. 202(a) (1982), by accepting studies based on a seven-day period from some telephone companies but refusing to accept such studies from petitioners. The Commission found that no unjust or unreasonable discrimination had occurred. See Reservation Tel. Coop., F.C.C. No. 85-632, paragraphs 32-37.
 
 II.
 A.
 
 16
 Our first task is simply to construe the meaning of the term "a representative period." In reviewing the Commission's interpretation of a settlement agreement within its field of expertise, we must consider whether the intent of the parties is clearly expressed in the document, and if it is, " 'that is the end of the matter.' " National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1572 (D.C.Cir.1987) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). If the intent of the parties is not clear, we typically defer to the agency's interpretation of the agreement, as long as it is a reasonable interpretation. See, e.g., Western Union Tel. Co. v. FCC, 815 F.2d 1495, 1502 (D.C.Cir.1987); MCI Telecommunications Corp. v. FCC, 712 F.2d 517, 532-33 & n. 18 (D.C.Cir.1983). In this case, since the agreements at issue simply refer to the Commission's own rules on this subject, the situation is indistinguishable from judicial review of an agency's interpretation of its own rules, which calls for substantial deference by the reviewing court. See, e.g., Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
 
 
 17
 It is not clear to us that the term "a representative period" must mean a seven-day period, as petitioners argue. The language calls for a representative period, not the most representative period. It therefore admits of considerable flexibility, since whether a period can be considered among those that are representative may vary not only during a given week, but also depending on the time of the month, or even of the year. Traffic studies based on a five-day period had always been the accepted norm in this industry, and indeed had framed the past course of performance between the parties in this case. We recognize that as technologies were changing, and ratemaking methodologies were developing greater sophistication, the difference in the patterns of use between weekdays and weekend days was widening. All the participants in this industry--the Commission, the state and local regulatory bodies, and the parties on either side of particular contracts--were eventually persuaded that the most truly representative period for traffic studies was a seven-day period. In fact, by 1984 this recognition led to an amendment in the language of the Separations Manual to require the use of a seven-day period for traffic studies throughout the entire industry. But patterns of use were still changing at the time this dispute arose, and these matters were very much in a state of flux. We thus would find it difficult to say that the Manual required petitioners and AT & T to use a sevenday period at a time when much of the industry was still basing traffic studies on a five-day period.
 
 
 18
 It thus appears that either a five-day period or a seven-day period was acceptable as "a representative period" at the time of this dispute. The Commission itself endorsed this view in dictum in a 1983 opinion. See Southern Bell Tel. & Tel. Co., 93 F.C.C.2d 1287, 1297 (1983). But in the order on review here, the Commission rejected that suggestion and held instead that the phrase "a representative period" had a meaning fixed by the particular period that a particular carrier had been using when the 1971 version of the Manual had taken effect. Reservation Tel. Coop., F.C.C. No. 85-632, p 28. Because we cannot affirm an agency's decision on any rationale other than the one it offers to explain its actions, see SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); SEC v. Chenery Corp., 318 U.S. 80, 87-88, 92-95, 63 S.Ct. 454, 459, 461-62, 87 L.Ed. 626 (1943), we must consider whether the Commission's interpretation can reasonably be squared with the language of the Manual.
 
 
 19
 In considering this question, it is crucial to bear in mind the independent problems that confronted the Commission in reaching its interpretation. As a matter of the Commission's own rules, it appears that it was necessary for this language to be frozen more rigidly, rather than being understood in its fuller and perhaps more natural latitude. The Commission's use of and dependence upon the Separations Manual closely determined the jurisdictional boundaries of federal regulatory power and of state and local regulatory power. Congress had enacted a detailed statutory provision that obliged the Commission to act jointly with representatives of those state and local bodies before undertaking any significant changes in the relative scope of its powers visa-vis the state and local authorities. The Commission could, of course, with a stroke of its pen have reinterpreted the phrase "a representative period" and allowed the seven-day period broadly to supplant the five-day period as the predominant basis for traffic studies and cost allocation in the industry. But the effects of this reinterpretation on the balance of federal and local regulatory powers might have been far-reaching since the allocation of costs affects jurisdiction. Unilateral action by the Commission that worked a massive alteration of that balance would not have comported easily with either the purposes or the simple language of Congress' 1971 enactment.
 
 
 20
 We therefore agree with petitioners that by the time this dispute arose a seven-day period may well have been somewhat more representative of their patterns of use than a five-day period. But we think that under the more general language in the Manual that was applicable at this time, the term "a representative period" probably embraced either a five-day period or a seven-day period. We hold, given the unavoidable restrictions that the Commission confronted in setting out its interpretation of this language, that it acted reasonably when it decided that carriers would be obliged to continue using the same periods they had used when the 1971 version of the Manual took effect. As we have indicated, we do not think that the language of the Manual clearly favors either the position advanced by the Commission or that advocated by the petitioners. We do think, however, that the Commission's interpretation "represents a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies." Chevron, 467 U.S. at 865, 104 S.Ct. at 2792-2793 (footnotes omitted).[4] Of course, petitioners and AT & T were free at all times to adopt in their private contracts a different view of how this language allocated petitioners' costs between the interstate and intrastate markets, or different language altogether, unless the Commission disapproved. They never agreed on any such formula, however, and chose instead to rely on the language in the Manual as it would be interpreted by the Commission. We find that interpretation to be a reasonable one, and we uphold it.
 
 B.
 
 21
 The Commission's denial of petitioners' claims of undue discrimination presents us with a much simpler issue. Petitioners contend that AT & T unjustly and unreasonably discriminated against them, in violation of 47 U.S.C. Sec. 202(a) (1982),[5] by refusing to accept traffic studies based on a seven-day period rather than a five-day period when AT & T had accepted this change in traffic studies from certain other carriers. The Commission responded, first, by observing that AT & T was free to refuse to renegotiate its private contracts with petitioners, which were a matter of mutual agreement between the parties, subject only to regulatory constraints. Reservation Tel. Coop., F.C.C. No. 85-623, p 36. The Commission's observation is correct. Cf. United Tel. Co. of Carolinas v. FCC, 559 F.2d 720, 723 (D.C.Cir.1977) (Act's purpose is "to protect the public interest rather than to provide a forum for the settlement of private disputes"). Nonetheless, petitioners have at least raised a question of whether the Commission could properly sanction AT & T's actions in accepting the revised traffic studies from some carriers but not from petitioners, given that the disparity represented a deviation from the Commission's stated position that all carriers were required to continue using the same representative period as the basis for traffic studies that they had used in 1971.
 
 
 22
 The Commission's explanation of its decision, however, is quite sensible. It noted that, for at least some time prior to the decision under review here, AT & T had begun to accept revised traffic studies from local carriers. At a certain point, however, AT & T may have realized that the revised traffic studies, if adopted by all local carriers, "could become a trend that would significantly reduce its share of [revenues]. Once it made such discovery, it would be reasonable to refuse to allow carriers to shift to seven-day duties who had not already done so while continuing to abide by its somewhat improvident agreements to pay seven-day settlements to some other carriers." Reservation Tel. Coop., F.C.C. No. 85-632, p 36. This decision seems quite rational. It rests on concerns similar to those the Commission acknowledged in deciding that the language of the Manual relevant to this dispute must be given a more rigid meaning than might otherwise have been understood--because the full impact of an industry-wide switch to seven-day studies was not initially appreciated. But we have held under section 202(a) that "when there is a neutral, rational basis underlying apparently disparate charges, the rates need not be unlawful." National Ass'n of Regulatory Comm'rs v. FCC, 737 F.2d 1095, 1133 (D.C.Cir.1984), cert. denied, 469 U.S. 1227, 105 S.Ct. 2224, 84 L.Ed.2d 364 (1985). We believe that such a "neutral, rational basis" has been shown here. This explanation also justifies the Commission's decision to give its interpretation of the Manual prospective effect only, thereby refusing to invalidate private agreements that had previously accepted a switch to studies based on a seven-day period. We therefore hold that even if AT & T could be said to have discriminated against petitioners by treating them differently from certain other local carriers, any such "discrimination" was not unjust or unreasonable. The Commission's decision is affirmed, and the petition for review is
 
 
 23
 Denied.
 
 
 
 [1]
 For example, language from one of these contracts reads:
 In making a basic separations study, the parties shall be governed by the separations principles and procedures set forth in the NARUC-FCC Separations Manual as modified by addenda, thereto, and appropriate separations and/or settlement arrangements recommended by the Joint Reports by USITA and Bell System Representatives in effect for the period studied.
 Reservation Tel. Coop., F.C.C. No. 85-632 (Dec. 5, 1985).
 
 
 [2]
 At the time of this dispute, the Separations Manual had been included among the Commission's rules by order of the Commission. See In re Jurisdictional Separations of Telephone Companies, 16 F.C.C.2d 317, 319, 331-35 (1969)
 
 
 [3]
 The pertinent language of Sec. 410(c) reads more fully:
 The Commission shall refer any proceeding regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations, which it institutes pursuant to a notice of proposed rulemaking ... to a Federal-State Joint Board. The Joint Board ... shall prepare a recommended decision for prompt review and action by the Commission. In addition, the State members of the Joint Board shall sit with the Commission en banc at any oral argument that may be scheduled in the proceeding. The Commission shall also afford the State members of the Joint Board an opportunity to participate in its deliberations, but not vote, when it has under consideration the recommended decision of the Joint Board or any further decisional action that may be required in the proceeding. The Joint Board shall be composed of three Commissioners of the Commission and of four State commissioners nominated by the national organization of the State commissions....
 
 
 [4]
 It might be argued that the Commission's interpretation is entitled to no deference from a reviewing court insofar as the Commission here modified its earlier views--albeit views stated in dictum--on this issue. See, e.g., Tennessee Gas Transmission Co. v. FERC, 789 F.2d 61, 62-63 (D.C.Cir.1986). It has never been supposed, however, that an agency cannot change its course even when there is ample reason for doing so; instead, we have held simply that an agency must supply a persuasively reasoned explanation for modifying its earlier position that is itself rationally grounded in the evidence before the agency. See, e.g., NAACP v. FCC, 682 F.2d 993, 998 (D.C.Cir.1982); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). In rejecting its dictum from the Southern Bell opinion, the Commission noted that this dictum had not taken into account the effects of Congress' 1971 enactment, and ran counter to the Commission's position in its earlier opinions on this issue. See Reservation Tel. Coop., F.C.C. No. 85-632, p 30 (referring to New York Tel. Co., 81 F.C.C.2d 128, 131, aff'd, New York Tel. Co. v. FCC, 631 F.2d 1059 (2d Cir.1980), and to Pacific Tel. & Tel. Co., 88 F.C.C.2d 934, 942 (1981))
 
 
 [5]
 This section states:
 It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.
 47 U.S.C. Sec. 202(a) (1982).