NL INDUSTRIES, INC., Petitioner,

v.

DEPARTMENT OF TRANSPORTA-
TION, Federal Aviation
Administration.

No. 89–1089.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 9, 1990.

Decided April 13, 1990.

Richard P. Taylor, Washington, D.C., for petitioner.

Cynthia A. Dominik, Atty., F.A.A., with whom Allan H. Horowitz, Atty., F.A.A., Washington, D.C., was on the brief, for respondents. B. Wayne Vance, Gen. Counsel, Dept. of Transp., Washington, D.C., also entered an appearance for Dept. of Transp.

Before BUCKLEY, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Circuit Judge BUCKLEY.

D.H. GINSBURG, Circuit Judge:

The Federal Aviation Administration found that NL Industries, Inc. violated the Hazardous Materials Transportation Act, 49 U.S.C. App. §§ 1801 *et seq.*, and the Department of Transportation Hazardous Materials Regulations, 49 C.F.R. parts 171–77, which implement it, and assessed a penalty of $50,000. NL objects on various grounds to both the liability and the penalty aspects of that decision. Finding no merit in NL's objections, we dismiss its petition for review.

## I. BACKGROUND

In 1983, the national oil company of Bolivia, Yacimientos Petroliferos Fiscales Boliviano (YPFB), ordered a number of chemical products from NL, a manufacturer located in Houston, Texas. YPFB sent NL purchase orders indicating that delivery was to be made to J.V. Pack Exports Co., a freight broker, "FAS Houston." They bore this legend:

> IMPORTANT: PLEASE INSURE PROPER DOMESTIC PACKAGING FOR SHIPMENT VIA AIR CHARTER TO BOLIVIA AS MATERIAL WILL BE SHIPPED IN SAME CARTONS AS RECEIVED.

Separately, YPFB arranged for J.V. Pack to accept delivery from NL and to forward the chemicals to it via Lloyd Aereo Boliviano (LAB).

NL thereafter sent part of the order to J.V. Pack (via Empire Truck Lines); at J.V. Pack's request, it sent the rest (again via Empire), including 79 drums of hazardous chemicals, to Flying Tiger Lines, an air cargo carrier that serves Houston to Miami, where it apparently interlines with LAB. NL also sent to J.V. Pack a "Shipper's Declaration for Dangerous Goods" certifying that the shipment was "in all respects in the proper condition for transport by air according to the applicable International and National Government Regulations." Flying Tiger, however, upon inspection of the 79 drums delivered to it, rejected the shipment because it did not appear to comply with applicable requirements for the transportation of hazardous materials; the carrier so notified the FAA. After an FAA agent had examined the drums and found many violations of the marking, labeling, and packaging regulations, the FAA found, "J.V. Pack notified NL that the shipment had been rejected, and based on a conversation with YPFB, advised NL to pick up the cargo and redrum it." NL did that, redelivered the drums to J.V. Pack, and arranged for an air freight forwarder properly to mark and label the drums.

The FAA found NL liable for 370 violations of the Hazardous Materials Regulations in connection with its "knowingly offering" the 79 drums for transportation by Flying Tiger when they "were not properly marked, labeled, described, packaged or in the condition required" for air transportation.

## II. ANALYSIS

NL concedes that the 79 drums did not comply with the regulations, but argues that, because it was neither the shipper nor the carrier of the drums, the Hazardous Materials Transportation Act is not properly applicable to it. Alternatively, it challenges the penalty as excessive.

### A. Applicability of the Statute and Regulations

■ The Act authorizes the Secretary of Transportation to promulgate regulations "applicable to any person who transports, or causes to be transported or shipped, a hazardous material...." 49 U.S.C.App. § 1804. NL urges that the statute therefore applies only to shippers and carriers, and that it performed in neither of those roles with regard to the 79 drums for which it was charged.

■ The statute does not invite so restrictive a reading, however. It defines " 'transports' or 'transportation' " broadly as "any movement of property by any mode, and any loading, unloading, or storage incidental thereto." Id. § 1802. Reading sections 1802 and 1804 together, we see that the Secretary is authorized to issue regulations applicable to any person that moves a hazardous material by any mode; or loads, unloads, or stores it incident to

such movement; or causes such movement, or the loading, unloading, or storage incidental thereto. Thus, the question of the application of the statute to a particular person is to be approached functionally, based upon the activities in which that person engaged, without regard to whether it is a shipper or a carrier.*

The implementing regulation is consistent with this approach. It provides:

> No person may offer or accept hazardous material for transportation in commerce unless that material is properly classed, described, packaged, marked, labeled, and in condition for shipment as required or authorized by this subchapter....

49 C.F.R. § 171.2(a). It thus places responsibility with one who transports hazardous materials or causes them to be transported, regardless of whether that person is a shipper or a carrier in either ordinary language or legal discourse relating to common carriers. NL does not contest the FAA's finding that the drums did not comply with the regulations applicable to air transportation. It argues, however, that because legal title to the goods passed to YPFB upon their delivery to Flying Tiger, NL's role ended with that delivery. In its brief, NL maintains that once "an FAS shipment ... is delivered to a domestic FAS destination, it is the foreign buyer—not the signatory seller—who offers the shipment for transportation to its export destination...."

■ Again, NL would read the regulations, as it would read the statute, in formal rather than functional terms. We think that the FAA reasonably concluded that its regulation, which applies to any person who "offer[s] ... hazardous materi-

---

* In concluding that NL is not within the scope of the statute, our dissenting colleague focuses narrowly on the definition of "cause," and apparently, albeit implicitly, assumes that the term "transports" applies only to the person that owns the goods at the time they are transported, since only the owner would be in a position to instruct the manufacturer regarding delivery, and to arrange for an agent to receive, check, document, and ship the goods. See diss. op. at 146. The functional definition of the term "transports," however, assimilates to the concept of "cause" not only the person that literally

transports the chemicals, but also any person that engages in activities "incidental thereto." 49 U.S.C. § 1802.

Furthermore, that YPFB might be liable for the non-conforming packaging, as the dissent observes, would not absolve NL of responsibility for its role in causing the transportation. See diss. op. at 146. The statutory definition of "transportation" clearly contemplates that responsibility may rest with more than one person, and nothing in the dictionary definition of "cause" suggests that an event may not have more than one cause.

al for transportation," is not restricted in its application to persons who hold legal title to the goods at the time of shipment.

This is not to say that a messenger service engaged to deliver hazardous material to a carrier thereby "offers" it for transportation by air; but NL is not merely playing the role of Mercury in the transaction for which it is being held accountable. The record is replete with evidence of NL's responsibility for, and role in, preparing the chemicals for shipment by air, beyond the role played by one that merely delivers the materials to an air carrier. YPFB's purchase order informed NL that the chemicals were to be shipped by air, and directed NL to prepare them for air shipment; NL signed a Shipper's Declaration for Dangerous Goods, certifying that the chemicals were in proper condition for air shipment, and typed "Houston, Texas" in the block labeled "Airport of Departure" and "Bolivia" in the block labeled "Airport of Destination"; and NL had the chemicals delivered to an air carrier knowing, as the FAA found, that it would in turn transport them by air. These activities together support the FAA's conclusion that NL "knowingly offer[ed]" the hazardous material for air transportation, and are therefore sufficient to hold NL responsible for the failure of the shipment to comply with the regulations for air transportation of hazardous materials.

The manufacturer of hazardous materials will not always be aware of the mode of transportation by which they will be shipped, of course, nor will it necessarily be in a position to control the condition of their packaging and labeling. That NL merely played an earlier role that "caused these hazardous materials to be introduced into commerce," as the FAA opinion says at one point, would not be a sufficient basis upon which to render it liable for subsequent regulatory violations: the statute does not impose upon every person with a "but for" causal relationship to the transportation of hazardous materials a continuing obligation to monitor the materials after they have left that person's control. Neither, however, does NL's status as the manufacturer rather than the shipper or carrier of the materials insulate it from liability when it also effectively "causes to be transported or shipped a hazardous material" by a mode for which it is not properly packaged.

### B. *Responsibility for Compliance*

■ NL also argues that it was "relieved from responsibility for the shipment" because YPFB contracted with J.V. Pack for that company to accept responsibility for forwarding the hazardous material by air. As NL acknowledges in its reply brief, this argument relies upon the assumption that responsibility for compliance lay in the first instance entirely upon YPFB, and came to rest upon others only if delegated by YPFB. As a matter of law, however, the conclusion that NL engaged in conduct within the scope of the statute and regulations, *viz.* offering the materials for transportation by air, is an adequate basis for liability regardless of whether YPFB delegated authority to act on its behalf; deputed or not, NL performed physical acts regulated by the statute.

### C. *Reasonableness of Penalty*

■ An administrative agency is entitled to substantial deference in assessing the civil penalty appropriate for a violation of its regulations. The agency's "choice of a sanction is not to be overturned unless 'it is unwarranted in law' or 'without justification in fact.'" *Panhandle Cooperative Ass'n v. EPA*, 771 F.2d 1149, 1152 (8th Cir.1985) (*quoting Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973)).

The law in which the agency must find its justification in this case authorizes the agency to assess a penalty of up to $10,000 for each violation of its regulations and requires it to:

take into account the nature, circumstances, extent, and gravity of the violation committed and, with respect to the person found to have committed such violation, the degree of culpability, any history of prior offenses, ability to pay,

effect on ability to continue to do business, and such other matters as justice may require.

49 U.S.C.App. § 1809. The FAA considered all of these factors in affirming the penalty recommended by the ALJ. NL objects, however, that the agency considered it relevant that NL had been cited for violating both state surface transportation and Federal Highway Administration hazardous materials regulations. We cannot say that this background is so unrelated to the present charges as to be an impermissible factor in the agency's mandatory consideration of the company's "history of prior offenses."

The FAA found 370 violations of its regulations, resulting in an effective penalty of $135 per violation. NL, maintaining that the amended complaint lists only "ten different basic violations of the regulations," puts the penalty per violation as $5,000, and argues that that amount is "considerably in excess of the customary fine per violation." Even admitting *arguendo* the purported distinction between violations and "basic violations," NL simply does not document its assertion that the penalty per violation is excessive. Moreover, the FAA has brought to our attention cases in which it did assess penalties ranging up to $5,000 per violation. *See, e.g., Transamerica Airlines,* Dkt. No. 85–107 (HM) (Oct. 1, 1985). Thus, even if NL is right about the number of "basic violations" involved, it has not been arbitrarily singled out for exemplary punishment.

■ NL also argues that its compliance program should mitigate the penalty assessed. The FAA considered that program under the heading of "other matters as justice may require," faulted the program in some respects, and noted that it began nearly two years after the YPFB incident. So far as appears, the agency did not consider the program as a mitigating factor, but in view of the reasons it offered for discounting the significance of the program, we cannot say that justice requires otherwise.

In sum, NL's challenge to the size of the penalty fails. The assessment of a $50,000 penalty for the violations found is within the scope of the FAA's authority, and the agency did not depart from the statute in its exercise of that authority.

## III. CONCLUSION

In view of the foregoing, the petition for review of the FAA's decision is

*Denied.*

BUCKLEY, Circuit Judge, dissenting:

I differ from the majority in one critical respect: I do not agree that simply by improperly packaging hazardous materials and having them delivered by truck within the city of Houston, NL can be said to have "caused" hazardous materials to be transported by air. As I believe the FAA's order imposing liability on NL exceeds the scope of the Hazardous Materials Transportation Act, I respectfully dissent.

Section 105(a) of the Act reads, in relevant part, as follows:

> The Secretary may issue ... regulations for the safe transportation in commerce of hazardous materials. Such regulations shall be applicable to any person who transports, or causes to be transported or shipped, a hazardous material, or who manufactures ... a package or container which is ... sold by such person for use in the transportation in commerce of certain hazardous materials.

49 U.S.C.App. § 1804(a) (1982). The statutory scheme is clear. The Act identifies three categories of persons to whom the Secretary's regulations are to apply. It follows, therefore, that a person may not be found in violation of the regulations unless he has transported hazardous materials, or caused them to be transported or shipped, or manufactured and sold containers for use in such transportation. The majority effectively concludes that NL Industries *caused* the intended transportation to Bolivia of the hazardous chemicals purchased by YPFB, and it is this conclusion with which I disagree.

In the decision here under review, the FAA found NL liable for "knowingly offering seventy-nine drums of hazardous mate-

rials for transportation by air when the drums were not properly [packaged etc.]," in violation of its regulations. In affirming the FAA's findings, the majority asserts that the implementing regulation, which provides in relevant part that "No person may *offer* . . . [improperly packaged] hazardous material for transportation in commerce," 49 C.F.R. § 171.2(a) (1988) (emphasis added), is a reasonable interpretation of the Secretary's authority under section 105(a) of the Act to issue regulations applicable to any person who *"causes* [hazardous materials] to be transported or shipped." 49 U.S.C.App. § 1804(a) (emphasis added).

The majority's analysis is based on the mistaken assumption that the words "cause" and "offer" are coextensive. Someone who delivers goods to a carrier for shipment in accordance with another person's instructions may well be said to have offered them for transportation. It does not follow, however, that that person has caused the goods to be shipped from the point of delivery to their ultimate destination. While the Secretary enjoys broad discretion in framing the regulations required to implement the Act, he may not apply a regulation in a manner that enlarges its scope beyond that of its enabling statute. *E.g., Pratt & Whitney Aircraft v. Secretary of Labor,* 649 F.2d 96, 103 (2d Cir.1981). Thus it is impermissible to apply section 171.2(a) of the regulations to someone who "offers" hazardous materials for transportation but who has not "caused" them to be transported.

To explain my position more precisely, I turn to the meaning of the word "cause." As there are no indications here that Congress intended otherwise, we may safely assume that the common usage of the word applies. *E.g., Inner City Broadcasting Corp. v. Sanders,* 733 F.2d 154, 158 (D.C. Cir.1984). *Webster's* defines "cause" in relevant part as "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state." *Webster's Third New International Dictionary* 356 (1981). Similarly, *American Heritage* defines it as follows: "1. a. Something that produces an effect, result, or consequence. b. The person, event, or condition responsible for an action or result." *American Heritage Dictionary* 249 (2d College ed. 1985). (By comparison, among the relevant definitions of the word "offer" are "to present for acceptance or rejection," to "tender" or "proffer." *Webster's* at 1566. Plainly, "offer" and "cause" are not synonymous.)

Applying the common meaning of the word "cause" to the instant case, I conclude that NL cannot be said to have caused—i.e., to have brought about or been responsible for—the intended transportation by air of the chemicals purchased from NL. That burden must lie with YPFB. It was YPFB that sent purchase orders to NL instructing it to deliver the goods to YPFB's agent, J.V. Pack; it was YPFB that arranged for J.V. Pack to receive the goods, check the inventory, prepare the necessary documentation, and ship the goods by air freight to Bolivia. NL, on the other hand, was neither asked, nor did it undertake, to arrange for the shipment of the goods to their ultimate destination in Bolivia. It did not decide the mode of transportation (sea or air) or select the carrier. Nor did it engage in the loading or storage of the chemicals incident to the shipment that would have brought it within the scope of 49 U.S.C.App. § 1802.

While the majority emphasizes that NL was aware that the goods were to be sent by air, that it was instructed to prepare them for air shipment, and that it signed a Shipper's Declaration, these factors were ancillary to, rather than the cause of, the intended shipment by air. Indeed, NL's Shipper's Declarations specify the consignee as "[YPFB], 3334 Richmond, Suite 105, Houston, Texas," confirming that the only shipment for which NL was responsible went no further than across town. Although NL no doubt caused goods destined for air shipment to Bolivia to be mispackaged and mislabeled, the only transportation that NL could be said to have caused was from its plant in Houston to the Flying Tiger and J.V. Pack facilities, also in Houston. This, however, was not the act for which the FAA found NL to be liable, and

it is axiomatic that we cannot affirm an agency's decision on any grounds other than those upon which the agency acted. *See, e.g., SEC v. Chenery,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Reservation Tele. Co-op v. FCC,* 826 F.2d 1129, 1134 (D.C.Cir.1987).

By blurring the plain language of the statute (in part by issuing an ambiguous regulation) and applying its regulations more broadly than the statute permits, the FAA gives section 1804(a) an uncertain scope while at the same time failing to find liable the one party that was clearly responsible for the intended transportation of the chemicals to Bolivia. As the FAA's order imposing liability on NL exceeds the permissible scope of the Act, I would grant the petition for review and reverse the FAA's decision.