867 F.2d 688
 276 U.S.App.D.C. 72
 TENNESSEE GAS PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Boundary Gas, Inc., Granite State Gas Transmission, Inc.,
Long Island Lighting Company, Brooklyn Union Gas
Co., Consolidated Edison Company of New
York, Inc., New Jersey Natural
Gas Co., Intervenors.
 No. 88-1166.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 22, 1988.
Decided Feb. 10, 1989.
 
 Douglas O. Waikart, with whom Harold L. Talisman, Robert H. Benna, David D. Withnell, Terence J. Collins and Ernest B. Abbott, Washington, D.C., were on the brief, for petitioner.
 Margaret L. Bollinger, Houston, Tex., also entered an appearance, for petitioner.
 Dwight C. Alpern, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.
 
 
 1
 Frederick M. Lowther, Washington, D.C., entered an appearance, for intervenor Boundary Gas, Inc.
 
 
 2
 Thomas F. Brosnan and Andrea J. Ercolano, Washington, D.C., entered appearances, for intervenor Granite State Gas Transmission, Inc.
 
 
 3
 James J. Stoker, III, Mineola, N.Y., Arnold H. Quint and James F. Bowe, Jr., Washington, D.C., entered appearances, for intervenor Long Island Lighting Co.
 
 
 4
 David L. Konick, Washington, D.C., entered an appearance, for intervenor Brooklyn Union Gas Co.
 
 
 5
 William I. Harkaway, Douglas M. Canter, Washington, D.C., and Barbara M. Gunther, New York City, entered appearances, for intervenor Consolidated Edison Co. of New York.
 
 
 6
 Nicholas W. Mattia, Jr., Roseland, N.J., entered an appearance, for intervenor New Jersey Natural Gas Co.
 
 
 7
 Before EDWARDS, WILLIAMS and FRIEDMAN*, Circuit Judges.
 
 
 8
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 9
 Customers of a pipeline commonly pay a "demand charge" that is set according to the number of units they are entitled to buy or ship, times some portion of the unit cost of service, and a "commodity charge" that is set according to their actual use, times a portion (typically the remainder) of the unit cost of service. The allocation of costs between the two charges determines the portion of risk borne by pipeline and customer respectively. We deal here with the limits imposed by the Federal Energy Regulatory Commission on the costs that pipelines may include in their demand charges.
 
 
 10
 In certifying Tennessee Gas Pipeline Company's construction of facilities and related transportation of certain Canadian natural gas, FERC attached a condition under Sec. 7(e) of the Natural Gas Act, 15 U.S.C. Sec. 717f(e) (1982), preventing Tennessee from charging a "one-part" rate, consisting exclusively of a demand charge, on which Tennessee and the shippers had agreed. See Boundary Gas, Inc., 40 F.E.R.C. p 61,088 (1987), reh'g granted in part, 41 F.E.R.C. p 61,375 (1987). This was a reversal of FERC's practice allowing such rates when a pipeline had specially constructed new facilities to provide transportation for a discrete group of customers who agreed in advance to such a pricing system. Because FERC failed to explain the shift, we reverse and remand the case for its further consideration.
 
 
 11
 The transportation facilities in question derive from the effort of several northeastern gas companies, most or all of them distributors, to secure access to Canadian natural gas. They formed a consortium, Boundary Gas, Inc., a "paper company" whose sole purpose is to purchase gas at the border from a Canadian pipeline and simultaneously resell it at cost to the consortium members. The Boundary repurchasers then ship the gas to the northeast through facilities newly constructed by Tennessee for that purpose. See Boundary Gas, Inc., 40 F.E.R.C. p 61,047 at 61,146 (1987) (Order affirming initial decision).
 
 
 12
 Tennessee and the Boundary shippers designed the transportation agreement to protect Tennessee from the risk that the facilities would be underused and from the risk that its use would partially displace Tennessee's sale of domestic gas. First, to ensure that the availability of alternative supplies would not leave Tennessee uncompensated for its investment in facilities to move Boundary gas, the shippers agreed to pay a one-part demand rate, computed as the units each shipper was entitled to ship, times the entire estimated unit cost of service. See 40 F.E.R.C. p 61,088 at 61,244. Second, in order to forestall the shippers--all but one of whom were regular customers of Tennessee--from reducing their purchases from Tennessee due to the availability of Boundary gas, the shippers promised to make best efforts to assure that any purchases of Boundary gas would be in addition to their exercises of previously agreed entitlements to Tennessee's gas. See 40 F.E.R.C. p 61,988 at 61,249. In ap proving Phase 1 of Tennessee's Boundary gas service, FERC approved both these provisions. See Boundary Gas, Inc. (Phase 1), 26 F.E.R.C. p 61,114 (1984),amended, 34 F.E.R.C. p 61,057 (1986); see also 40 F.E.R.C. p 61,088 at 61,244 (1987).
 
 
 13
 Later the Commission approved Tennessee's construction and use of certain transportation facilities on an interim basis, with the understanding that on the approval of Phase 2 they would be used for the transportation of Boundary gas. 36 F.E.R.C. p 61,370 (1986), amended, 40 F.E.R.C. p 61,217 (1987); see also Petitioner's Brief at 9-10 n. 7. Finally, Tennessee filed an offer of settlement for Phase 2, under which it would receive certification of its transportation service for the full 92,500 Mcf per day of Boundary gas; the Commission approved on July 24, 1987. See Boundary Gas, Inc., 40 F.E.R.C. p 61,088, reh'g granted in part, 41 F.E.R.C. p 61,375 (1987).
 
 
 14
 In approving Phase 2, however, the Commission rejected both the arrangements for the protection of Tennessee. First, it discarded the clauses requiring the shippers to use best efforts to assure that their Boundary gas takes did not cut their use of Tennessee gas below their regular entitlements. It found that they conferred an improper preference on Tennessee's general system sales, to the possible detriment of other gas sellers. FERC also noted its general policy, embodied in its Order No. 436,[1] that a pipeline should not be permitted to refuse to transport gas in competition with its own sales. 40 F.E.R.C. at 61,249. Tennessee does not contest this decision.
 
 
 15
 The Commission also rejected Tennessee's one-part demand rate. Instead, it required the company to substitute a two-part rate designed along the same principles as Tennessee's firm sales rates--the "modified fixed-variable" methodology. As applied to the transportation involved here, the rate would contain a demand charge covering depreciation and return on debt, and a commodity charge covering the costs of equity capital and associated taxes, plus some trivial variable costs.[2] As a result, about one third of Tennessee's fixed costs would be shifted into the commodity charge, and thereby put at risk. See Petitioner's Brief at 16-17.
 
 
 16
 In its first pass at the issue, the Commission noted that in Order No. 380 it had required the elimination of variable costs from "minimum bills,"[3] and said that it was ordering the ratemaking change "[f]or similar reasons." 40 F.E.R.C. at 61,251. On Tennessee's petition for rehearing, it recognized that the analogy was quite inexact. The variable costs at stake here are concededly de minimus; there is no risk that the shippers would pay for material costs not incurred. See 41 F.E.R.C. at 62,033.
 
 
 17
 In responding to Tennessee's petition for a rehearing, the Commission developed an alternative rationale--though still relying on some of the policy underlying Order No. 380. It argued that the one-part demand rate would have anti-competitive effects in that each shipper's assessment of other supply alternatives would be distorted by its having already paid for transportation of its Boundary gas. Id. The incremental cost of transportation of Boundary gas would thus be effectively zero, giving that gas a competitive advantage over alternative supplies. The Commission plainly viewed that competitive advantage as artificially distorting the market.
 
 
 18
 Further, the Commission relied on an analogy to its ratemaking prescription for "blanket certificate" transportation under Order No. 436. For such transportation, the Commission had prescribed that charges were to be "volumetric," i.e., based on actual volumes transported, except that a pipeline could charge a "reservation" fee. The latter fee, however, was to include no variable costs and no more of the pipeline's fixed costs that would be permitted under the methodology employed in determining the demand charge for its sales service. See id.; see also 18 C.F.R. Sec. 284.8(d) (1988). Although Tennessee's service for Boundary gas is not under a blanket certificate covered by Order No. 436, the Commission noted that since the adoption of that order it had applied the same principle to individually certificated transportation service.
 
 
 19
 Finally, as to Tennessee's argument that the ratemaking change undercut expectations based on its contracts with the shippers and the Commission's own approval of the one-part rate in the Phase 1 proceedings, the Commission responded only obliquely:
 
 
 20
 We do not believe we would be justified in departing from this policy [i.e., its policy requiring parallelism in structure of transportation and sales rates] because the Phase 2 settlement agreement entered into by Tennessee supersedes the agreement for Phase 1 service for which we approved a one-part demand rate.
 
 
 21
 41 F.E.R.C. at 62,033.
 
 
 22
 Tennessee notes that in Order No. 380 and Order No. 436 the Commission aimed primarily at assuring that pipelines supplying gas were under adequate incentives to keep their gas costs and prices down. For example, in explaining Order No. 380, the Commission argued that the inclusion of variable costs in minimum bills forced customers to pay for costs not incurred, that the insulation of pipelines and producers from market risk inhibited price reductions, and that the bills prevented purchasers from pursuing a least-cost gas purchasing policy. See Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bill Provisions, F.E.R.C. Statutes and Regulations p 30,571 at 30,962-64 (1984).
 
 
 23
 The first point of course is here irrelevant, as the variable costs are trivial. The second and third cut in some respects against the Commission's action. As applied to this service, the one-part rate reduces the incremental transportation costs of Boundary gas to zero, puts Tennessee's own gas at a competitive disadvantage and sharpens its incentives to constrain the cost of its gas.
 
 
 24
 At oral argument Commission counsel recognized the above, and argued that a two-part rate, by putting Tennessee's return on equity at risk, improved its incentives to constrain the costs of equity capital. As the Commission never suggested this justification, much less explored its underpinnings or ramifications, we may not here rely on the theory. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 318 U.S. 80, 87-88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); Alltel Corp. v. FCC, 838 F.2d 551, 562 (D.C.Cir.1988).
 
 
 25
 A similar focus on sharpening incentives to constrain gas prices underlay the Commission's Order No. 436. There the Commission said that its "overriding" goal was to "(1) Retain and revise utility-type regulation over the interstate transportation function ... yet (2) Allow the commodity market for natural gas to continue to develop in a competitive fashion." Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, F.E.R.C. Statutes and Regulations p 30,665 at 31,474 (1985). By "unbundling" transportation and gas sales, it sought to counteract pipelines' reluctance to transport gas in competition with their own system supply, see id. at 31,488, and thereby to establish a competitive market in gas. As noted in relation to Order No. 380, this is not obviously supportive of the Commission's present action, which tends to shelter Tennessee's gas sales from Boundary gas competition.
 
 
 26
 It is quite true that in Order No. 436 the Commission adopted the rule, codified in 18 C.F.R. Sec. 284.8(d), that the fixed reservation fee for transportation service under that order must be no higher than what is dictated by the methodology used in calculating its sales rates. The Commission's purpose appears to have been to reduce or eliminate pipelines' bias against offering transportation for gas sold by producers or others in competition with its own gas sales. See F.E.R.C. Statutes and Regulations Sec. 30,665 at 31,495. The validity of that rule is not at issue here. But Tennessee points out, as it did in seeking rehearing, that on several occasions since the adoption of Order No. 436 the Commission has allowed a one-part demand rate for transportation where the pipeline constructed new facilities for specific customers that agreed to pay the costs in that fashion. See Equitable Gas Co., 36 F.E.R.C. p 61,147 at 61,368 (1986); Carnegie Natural Gas Co., 35 F.E.R.C. p 61,281 at 61,639, 61,642 (1986); Texas Eastern Transmission Corp., 35 F.E.R.C. p 61,271 at 61,618 (1986); Consolidated Gas Transmission Corp., 35 F.E.R.C. p 61,295 at 61,679 (1986). The cases do not articulate the reason; perhaps the Commission has approved this pricing because such arrangements seem virtually indistinguishable from the shippers' providing their own transportation through a joint venture--in which case they normally would bear the entire risk of underuse.
 
 
 27
 In any event, the Commission's orders here neither acknowledge these precedents nor purport either to distinguish them or to explain its apparent rejection of their approach. Thus the Commission has "glosse[d] over or swerve[d] from prior precedents without discussion," Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), and its decisionmaking can hardly be viewed as "reasoned." See also Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
 
 
 28
 Closely coupled with the Commission's unexplained swerve is its apparent disregard for the significance of the shippers' prior contractual commitment to the one-part rate. Of course contracts do not control; the premise of regulation is that because of monopoly conditions firms' agreements will not so well accord with the public interest as they would under competition. Here, however, it is not clear whether that consideration applied. It is perfectly possible that the Boundary shippers, in originally engaging Tennessee to provide the facilities and service, were able to choose among a fairly wide range of possible pipeline builders and operators; if this were true, Tennessee may have enjoyed no market power at the time of the negotiations. But as the buyers are most or all of them gas distributors, and therefore themselves regulated monopolies, their incentive to insist on the best terms is somewhat blunted. Accordingly no one questions the Commission's power, in a general sense, to set aside contract terms.
 
 
 29
 But that does not mean that the Commission can without explanation set aside expectations memorialized in contracts and sanctioned by the Commission itself in the Phase 1 proceedings. As we have said more than once before, "[t]he Commission may not 'cavalierly disregard[ ] private contracts' in exercising its authority under the NGA." Tennessee Gas Pipeline Co. v. FERC, 824 F.2d 78, 82 (D.C.Cir.1987) (quoting ANR Pipeline Co. v. FERC, 771 F.2d 507, 519-520 (D.C.Cir.1985)).
 
 
 30
 FERC's observations on this issue, quoted above at 691, seem hypertechnical at best, and are not even framed as justifications for overriding the contracts. The technical fact that the Phase 2 settlement agreement "supersedes" Phase 1 hardly eradicates the contracts or the Commission's prior blessing. The costs are sunk and the contracts long dry. As in the earlier Tennessee case, the Commission's rejection of the contracts here seems distinctly cavalier.
 
 
 31
 The case is remanded to the agency for further proceedings consistent with this opinion.
 
 
 32
 SO ORDERED.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 436, 50 Fed.Reg. 42408 (1985), F.E.R.C. Stats. & Regs., Regulations Preambles 1982-1985 p 30,665, reh'g granted in part and denied in part, Order No. 436-A, 50 Fed.Reg. 52217 (1985), F.E.R.C. Stats. & Regs., Regulations Preambles 1982-1985 p 30,675, reh'g granted in part, Order No. 436-B, 51 Fed.Reg. 6398 (1986), F.E.R.C. Stats. & Regs. p 30,688, reh'g denied, Order 436C, 51 Fed.Reg. 11566 (1986), 34 F.E.R.C. p 61,404, reh'g denied, Order 436-D, 51 Fed.Reg. 11569 (1986), 34 F.E.R.C. p 62,405, reconsideration denied, Order No. 436-E, 51 Fed.Reg. 1156 (1986), 34 F.E.R.C. p 61,403, reversed in part and remanded, Associated Gas Distributors v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied, sub nom. Southern California Gas Co. v. FERC, --- U.S. ----, 108 S.Ct. 1469, 99 L.Ed.2d 698 (1988)
 
 
 [2]
 For example, of the more than $16 million total charges allocated to the Boundary project for the year starting November 1, 1987, the variable costs are only $4,377. J.A. 174
 
 
 [3]
 A minimum bill is similar to a demand charge in that it is payable regardless of the customer's actual gas purchases