WALLACE, Circuit Judge,
concurring and dissenting.
I write separately to express my disagreement with the majority opinions analysis of the effect the termination agreements between Boston Edison and Montaup have on refunds ordered by FERC.
I
The majority opinion states, “the refunds awarded to the buyers by FERC are not rights under the agreement at all; indeed, if the agreements were respected, there would be no refunds. It is only because FERC has overridden the agreements and awarded refunds under the statute that refund claims might exist.” [Majority Opinion at 70] However, it is equally clear that without the original contractual relationship between Boston Edison and Montaup, the refund obligation would not exist. It is true that the original contracts between Boston Edison and Montaup did not contain a provision stating, “FERC-ordered refunds shall be considered as a right or obligation under the contract,” but they did contain language stating, “This Agreement is made subject to present and future Federal, State and local laws and to present and future regulations and orders properly issued by Federal, State and local bodies having jurisdiction ...” [Majority Opinion at 66 (emphasis added) ] While the majority rightly holds that this provision does not assist FERC in its argument that the “just and reasonable” standard should apply, we must not overlook the fact that this language was drafted with the knowledge of FERC’s authority over the contracts. Thus, it does indicate an intent by the parties to be bound by any properly issued FERC order involving their contractual relations, including FERC-direet-ed refunds.
I am further troubled by the majority’s analysis because all of the parties, including FERC, proceeded under the assumption, until we ordered supplemental briefing on the issue, that Section 7 of the termination agreements reference to “rights and obligations” encompassed the refunds ordered by FERC. Instead, the parties focused on whether the termination agreement reserved or extinguished Mon-taups right to a FERC-ordered refund, not on whether such a refund constituted a right under the original contracts. In *72 deed, FERC wrote in its supplemental brief, “It cannot be said with certainty whether the Commission would agree or disagree with the [majority’s] suggested reading or, alternatively, find it to be a permissible alternative, because the Commission simply was not presented with it and has not addressed it.” I respectfully point out that a “court ordinarily must review a decision of an administrative agency on the basis of the agency’s own rationale; unlike the situation involving appellate review of judicial decisions, it cannot affirm the agency on a theory that, although supported by the record, was not the basis of the agency’s ruling.” Bivings v. United States Dep’t. of Agriculture, 225 F.3d 1331, 1335 (Fed.Cir.2000) (referencing SBC v. Chenery Corp., 318 U.S. 80, 87-88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). I would, therefore, reach the question of whether the termination agreement extinguished or reserved Montaups right to FERC-ordered refunds.
II
Section 7 of the termination agreement provides, “To the extent that continuation or survival of the rights and obligations of Boston Edison and Montaup under the Power Sale Agreement are not expressly provided for in this Amendment, they are hereby extinguished.” FERC (and Monta-up as amicus) argue that sections 6 and 15 of the termination agreements support its position that FERC-ordered refunds were expressly reserved rather than extinguished.
Section 15 of the termination agreement provides:
Montaup reserves all rights and defenses that exist pursuant to the Power Sale Agreement and prior settlements between the Parties with respect to any amount paid by Montaup pursuant to this Amendment, including but not limited to such costs that are incurred by reason of Boston Edison’s negligence, willful misconduct, or violation of any law or regulation.
(Emphasis added). Boston Edison does not charge return on equity “pursuant to this Amendment;” return on equity is fixed in the base entitlement contracts. Thus, since Montaup is not making return on equity payments “pursuant to this Amendment,” section 15 cannot reserve any rights with respect to such payments.
Section 6 of the termination agreement provides:
Billing and Accounting. The Parties respective rights and obligations associated with billing, payment, accounting and refunds for charges incurred by Monta-up pursuant to the Power Sale Agreement prior to the Effective Date shall be determined in accordance with Section C-8 of the Power Sale Agreement.
(Emphasis added). Standing alone, the first part of this provision seems broad enough to encompass FERC-ordered refunds; however, the section unambiguously provides that any refund-associated right can only be determined pursuant to the procedures of section C-8 of the Power Sale Agreement.
Section C-8 of the Power Sales Agreement discusses billing procedures. For example, C-8.3 states:
Buyer shall not have the right to challenge any monthly bill, to invoke arbitration of the same or to bring any court or administrative action of any kind questioning the propriety of said bill after a period of one (1) year from the date the bill is rendered. In the case of a bill containing estimates, the Buyer shall not have the right to challenge the accuracy of said bill after a period of one (1) year from the date the bill is adjusted to reflect the actual amount.
Paragraph C-8 contains no provision explicitly authorizing Montaup to challenge the contractual rate of the return on equity by using its procedures. Moreover, it is unlikely that section C-8 implicitly gives Montaup such a right since the rate of *73 return on equity was already explicitly established elsewhere in the contracts. The contracts also contain a provision requiring that amendments to the contract reflect the mutual agreement of the parties. It would nullify these amendment provisions if section C-8 were interpreted as giving Montaup the ability to challenge the return on equity provisions by mounting an attack through the provisions of section C-8. In addition, section C-8, during the life of the original contracts, was used only for the purpose of challenging the mathematical accuracy of bills and not as a mechanism for achieving unilateral change of the contract.
I would hold that the termination agreements extinguished Montaups right to FERC-ordered refunds. Further, since such an interpretation is determinative of Montaups rights, there is no need to address whether FERC applied the correct standard, although I agree with the majority’s discussion of that issue.