Angela C. HUGHES, Plaintiff

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant

No. CIV.A. 102CV00008.

United States District Court,
W.D. Virginia,
Abingdon Division.

June 20, 2002.

Gerald Francis Sharp, LeBanon, VA, for Plaintiff.

Sara Bugbee Winn, Thomas L. Eckert, U.S. Attorney's Office, Roanoke, VA, for Defendant.

## MEMORANDUM OPINION

SARGENT, United States Magistrate Judge.

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand this case for further evaluation.

### I. Background and Standard of Review

Plaintiff, Angela C. Hughes, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 1991–1992 & Supp.2001). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3) (West Supp.2001). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C.A. § 636(c)(2) (West 1993).

■ The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990) (quoting *Laws,* 368 F.2d at 642).

The record shows that Hughes filed previous applications for SSI and DIB in June and August 1998, respectively. (R. at 15.)

Her alleged onset date was January 10, 1998. (R. at 15.) Her claims were denied initially and on reconsideration. (R. at 15.) She did not appeal the decision. (R. at 15.) Hughes filed her current application for SSI on or about October 14, 1999, and her current application for DIB on or about October 14, 1999, alleging disability as of January 6, 1998, based on problems with her left eye, legs and back. (Record, ("R."), 54–56, 64, 178–81.) Hughes's claims were denied both initially and on reconsideration. (R. at 33–35, 36, 38–39, 184–86, 189–90.) Hughes requested a hearing before an administrative law judge, ("ALJ"), (R. at 40), but the ALJ vacated the reconsideration determination and remanded the case by order dated June 22, 2000, for further evaluation of Hughes's mental status. (R. at 43–44.) Her claims were again denied. (R. at 45–46, 193–94.) Hughes again requested a hearing before an ALJ, (R. at 47), and this hearing was held on July 5, 2001, at which she was represented by counsel. (R. at 208–25.)

By decision dated July 16, 2001, the ALJ denied Hughes's claims. (R. at 15–19.) The ALJ found that Hughes met the disability insured status requirements of the Act on January 6, 1998, and continued to meet them through September 30, 1999, but not thereafter. (R. at 18.) The ALJ also found that Hughes had not engaged in substantial gainful activity since January 6, 1998. (R. at 18.) The ALJ found that the medical evidence established that Hughes had a severe impairment, namely borderline to low average intellect, but he found that Hughes did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ further found that Hughes's subjective allegations were not credible and were not supported by the documentary evidence. (R. at 18.) The ALJ con-

cluded that Hughes retained the residual functional capacity to perform work-related activities except for work involving highly skilled or complex tasks. (R. at 18.) The ALJ found that, because Hughes's past relevant work as an egg packer did not require the performance of highly skilled or complex tasks, she was able to return to this work. (R. at 19.) Thus, the ALJ found that Hughes was not under a disability as defined by the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) (2001).

After the ALJ issued his decision, Hughes pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 6–8.) Hughes then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2001). The case is before this court on the Commissioner's motion for summary judgment filed April 11, 2002, and Hughes's motion for summary judgment filed April 26, 2002.

## II. *Facts*

Hughes was born on November 2, 1967, (R. at 54, 178, 211), which classifies her as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2001). Hughes has an eighth-grade education and past relevant work experience as a sewing machine operator, a security guard, an egg packer and a supervisor at an egg packing plant. (R. at 65, 83, 100, 212, 213–15.)

At her hearing, Hughes testified that she had worked as a sewing machine operator at three different sewing factories. (R. at 213.) She stated that she had to quit her last job as a sewing machine operator after a needle scratched her left eye. (R. at 213.) She stated that she had experienced difficulty with her eye since the incident. (R. at 213.) Hughes also

testified that she had performed security work in the past for approximately two to three months and had worked as an egg packer before becoming a supervisor at an egg packing plant. (R. at 214.)

Hughes testified that she had difficulty sleeping due to pain in her neck, back, legs and arms. (R. at 216.) She stated that the pain was constant. (R. at 216.) Hughes testified that, on a good day, she could perform household chores with breaks. (R. at 217.) She also stated that she was able to take care of her son. (R. at 217.) Hughes stated that she had difficulty standing due to problems with her legs, resulting from two separate injuries. (R. at 217–18.) She testified that she had injured the cartilage in her left leg when she was 15 years old in a bicycle accident, and she stated that a truck had run over her right leg three years prior to the hearing. (R. at 218.) Hughes further testified that she had difficulty lifting and carrying heavy objects, estimating that she could lift items weighing up to 20 pounds but not repeatedly. (R. at 218.) Hughes stated that she was seeing Dr. Yousuf, but not on a regular basis because she could not afford it. (R. at 218.) She stated that she was not taking any prescription medications because she did not have the money to get her prescriptions filled. (R. at 218–19.)

Hughes further testified that she could see out of her left eye, but it would "quiver" and become blurry. (R. at 219.) She stated that she did not wear glasses. (R. at 219.) Hughes testified that she could read with her left eye "for a few minutes" before it would become blurry. (R. at 221.) Hughes stated that her eye problem would interfere with her ability to see and to use a sewing machine. (R. at 221.) She stated that she had seen two specialists, but neither could find anything wrong with her eye. (R. at 221–22.) She was told that her eye had been scratched and should heal within two days. (R. at 222.) However, Hughes testified that her eye had not improved. (R. at 222.)

Hughes testified that she got along "good" with people and spent her time with her son and working puzzles. (R. at 219.) Hughes further testified that she was able to grocery shop, and she stated that she received visits from friends and family occasionally. (R. at 219–20.) Hughes stated that she had a driver's license. (R. at 220.) She stated that she was unable to perform tasks as quickly as she had in the past, estimating that it took her twice as long. (R. at 220–21.)

Donna Bardsley, a vocational expert, also was present and testified at Hughes's hearing. (R. at 222–24.) Bardsley classified Hughes's past relevant work as a sewing machine operator as medium[1] and semi-skilled, as an egg packer as light[2] and unskilled and as a supervisor as light and skilled. (R. at 222.) Bardsley was asked to assume an individual of Hughes's age, education and work experience, who had the residual functional capacity to perform light work and who had the mental limitations as set forth in the mental assessment completed by R.J. Milan, Jr., Ph.D., a state agency psychologist. (R. at 222–23.) Bardsley testified that jobs exist-

---

1. Medium work involves lifting items weighing up to 50 pounds occasionally with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2001).

2. Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2001).

ed in significant numbers in the national economy that such an individual could perform, including jobs as a sales clerk, a cashier, a cleaner, a hand packager, a sorter and an assembler. (R. at 223.) Bardsley was next asked to assume the same individual, but who had the mental limitations as set forth in the mental assessment completed by L. Andrew Steward, Ph.D., a licensed clinical psychologist. (R. at 223–24.) Bardsley testified that such an individual would not be able to perform any jobs. (R. at 224.)

In rendering his decision, the ALJ reviewed records from Russell County Medical Center, ("RCMC"); Johnston Memorial Hospital; Dr. William F. Prestowitz, M.D., an opthomologist; Dr. Faisal W. Chaudhry, M.D.; Dr. Robert O. McGuffin, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; L. Andrew Steward, Ph.D., a licensed clinical psychologist; R.J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Michael J. Hartman, M.D., a state agency physician; and Abingdon High School. Hughes's counsel submitted additional medical records from Community Medical Center and Robert C. Miller, Ed. D., a licensed clinical psychologist, to the Appeals Council.[3] .

Hughes presented to RCMC on August 10, 1999, with complaints of back pain and difficulty sleeping. (R. at 101–06.) She was diagnosed with muscle spasms on both sides of the lower back. (R. at 102.) The notes reveal that Hughes ambulated independently and was able to perform activities of daily living independently. (R. at 103.) She was prescribed pain medication and was advised to follow up with her primary physician. (R. at 102, 106.)

Hughes presented to Johnston Memorial Hospital on September 17, 1999, with complaints of severe back pain upon movement. (R. at 108–09.) Hughes reported that she was not taking any pain medication at that time. (R. at 108.) Straight leg raise testing was positive on the right at 30 degrees. (R. at 109.) Hughes had diffuse, mild tenderness in the lumbar spine. (R. at 109.) She was diagnosed with chronic back pain. (R. at 109.)

Dr. William F. Prestowitz, M.D., an opthomologist, summarized his treatment of Hughes in a report dated November 3, 1999. (R. at 111–12.) Dr. Prestowitz noted that he had initially seen Hughes on August 27, 1997, following a work-related accident in which a sewing needle broke and Hughes felt a foreign body sensation in her left eye. (R. at 111.) At that time, Hughes was diagnosed with a corneal abrasion at a local emergency room and was referred to Dr. Prestowitz for subsequent care. (R. at 111.) Hughes had a corneal abrasion but no penetration of the globe. (R. at 111.) She was treated with simple lubricants and asked to return as needed. (R. at 111.) Her vision at that time was 20/20 without correction in the left eye and 20/30 without correction in the right eye. (R. at 111.) Dr. Prestowitz noted that, since that initial visit, Hughes had presented to his office continuing to complain of a foreign body sensation in her left eye. (R. at 111.) On September 3, 1999, Hughes complained that her left eye "hurts constantly" like a knife striking her behind the eyeball. (R. at 111.) An examination revealed 20/20 vision without correction in both eyes and a completely normal ocular examination. (R. at 111.) Dr. Prestowitz opined that Hughes was malin-

---

**3.** Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6–8), this court also should consider this evidence in determining wheth-

er substantial evidence supports the ALJ's findings. *See Wilkins v. Secretary of Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991).

gering or had a hysterical conversion reaction. (R. at 111.) In any event, Dr. Prestowitz noted that there was no objective evidence of ocular disease and that Hughes was not disabled in any way due to ocular problems. (R. at 111.) Dr. Prestowitz noted that "[h]er problem is purely psychological." (R. at 111.)

Hughes saw Dr. Faisal W. Chaudhry, M.D., on December 3, 1999, for a physical evaluation. (R. at 113–17.) Hughes complained of chronic low back pain with radiation into the right hip and lower leg and bilateral knee pain. (R. at 113.) Dr. Chaudhry noted that Hughes could not sit or walk for more than 30 minutes without interruption. (R. at 113.) Hughes reported that she could lift items weighing up to 15 pounds at a time, but could not walk more than half a mile at a time. (R. at 113–14.) Dr. Chaudhry noted that Hughes did not appear to have extreme difficulty in performing activities of daily living. (R. at 114.) Dr. Chaudhry further noted that Hughes's mini mental status examination was normal and her memory was adequate. (R. at 114.) He reported that Hughes was complaining of different variable symptoms in different areas of the body, which did not coincide with the physical findings on examination. (R. at 114.) An examination of Hughes's back and spine revealed no gross abnormality. (R. at 116.) She had a mild limitation of motion in the lower back due to pain and a mild limitation of motion in the cervical spine upon flexion and extension. (R. at 116.) Hughes was diagnosed with chronic lumbosacral spine and musculoskeletal pain, right hip bursitis/radiculitis and bilateral knee pain, stable. (R. at 116.) An x-ray of the lumbosacral spine revealed no demonstrable abnormality. (R. at 118.) Dr. Chaudhry noted that Hughes's low back pain was mostly musculoskeletal in nature, and he opined that physical therapy would improve her range of motion along with some nonsteroidal, anti-inflammatory medications. (R. at 116.) Dr. Chaudhry noted that Hughes did not have any significant visual problem at that time, and he further noted that her left arm injury was stable. (R. at 116.) Hughes's knee examination was unremarkable with good range of motion. (R. at 116–17.) Dr. Chaudhry opined that Hughes was exaggerating her symptoms and the physical examination did not coincide with the severity of her alleged symptoms. (R. at 117.)

Dr. Robert O. McGuffin, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment of Hughes on December 21, 1999. (R. at 121–28.) Dr. McGuffin found that Hughes could lift items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 122.) He found that she could stand and/or walk for six hours in an eight-hour workday and she could sit for six hours in an eight-hour workday. (R. at 122.) Dr. McGuffin found that Hughes was unlimited in her ability to push and/or pull. (R. at 122.) Dr. McGuffin further found that Hughes could occasionally climb ramps, stairs, ropes and scaffolds and she could occasionally balance, stoop, kneel, crouch and crawl. (R. at 124.) He found that Hughes could never climb ladders. (R. at 124.) Dr. McGuffin found no other limitations. Dr. Frank M. Johnson, M.D., another state agency physician, affirmed Dr. McGuffin's findings on April 5, 2000. (R. at 128.)

Hughes saw L. Andrew Steward, Ph.D., a licensed clinical psychologist, on March 24, 2000, for a psychological evaluation at the request of her attorney. (R. at 129–33.) Steward described Hughes's affect as constricted and her mood as anxious. (R. at 129.) He noted that her thought content and organization were impoverished but not confused. (R. at 129.) Steward found that all mental functions and memo-

ry functions were depressed. (R. at 129.) Hughes reported that she had been very nervous for several years. (R. at 130.) She stated that children, noise and crowds bothered her, except for her son, whom she was used to. (R. at 130.) Steward noted that Hughes had never been psychiatrically hospitalized and she received no psychiatric services regularly. (R. at 130.) She reported that she was using only over-the-counter medications. (R. at 130.)

Hughes reported that she was able to get her son ready for school, play with her dog and "mess around" in her yard. (R. at 130.) She reported her hobbies to include crocheting. (R. at 130.) She stated that driving hurt her right leg. (R. at 131.) Hughes stated that she visited her family, but not very much, and she received visitors "sometimes." (R. at 131.) Steward administered the Wechsler Adult Intelligence Scale–III, ("WAIS–III"), test, and Hughes achieved a verbal IQ score of 72, a performance IQ score of 69 and a full-scale IQ score of 69. (R. at 131.) Steward noted that Hughes's full-scale IQ score fell within the mild mental retardation range. (R. at 131.) He noted that she was below average in all areas of intellectual abilities measured. (R. at 131.) Steward also administered the Minnesota Multiphasic Personality Inventory–2, ("MMPI–2"), and the results were deemed valid. (R. at 132.) Hughes scored high on the depression scale. (R. at 132.) She was diagnosed with dysthymic disorder, generalized anxiety disorder, mild mental retardation and a then-current Global Assessment of Functioning, ("GAF"), score of 51.[4] (R. at 133.) Steward concluded that Hughes was permanently and totally disabled from any

type of substantial gainful occupation on a sustained basis for at least one year or more. (R. at 133.) Steward rated Hughes's prognosis as "poor." (R. at 133.)

Steward also completed a mental assessment indicating that Hughes had a fair ability to follow work rules, to maintain attention and concentration, to understand, remember and carry out simple job instructions, to maintain personal appearance and to demonstrate reliability, a poor ability to relate to co-workers, to use judgment, to deal with work stresses, to function independently, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations and no ability to deal with the public, to interact with supervisors and to understand, remember and carry out complex job instructions. (R. at 134.)

Hughes saw Heather K. Jessee, a registered nurse with Community Medical Care, with complaints of right leg pain, low back pain, neck pain and left arm numbness on May 19, 2000. (R. at 141–42.) A full examination revealed a full range of motion of the extremities and knee. (R. at 142.) There was no swelling or deformity noted. (R. at 142.) Patellar reflexes were 2+ and equal bilaterally. (R. at 142.) There was no decreased sensation in the lower extremities. (R. at 142.) Hughes had no point tenderness with palpation of the spine, but she did have some stiffness with range of motion of the cervical spine. (R. at 142.) Straight leg raise testing was negative, and there was no costovertebral angle tenderness. (R. at 142.) Hughes had a full range of motion of her left arm.

---

4. The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, (DSM–IV), 32 (American Psychiatric Association 1994). A GAF of 51–60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM–IV at 32.

(R. at 142.) She was diagnosed with chronic low back pain and neck pain and chronic right leg pain, status post injury. (R. at 142.)

On December 4, 2000, R.J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), indicating that Hughes suffered from a dysthymic disorder, mental retardation and an anxiety related disorder, not otherwise specified. (R. at 143–57.) Milan noted that, although Hughes's IQ scores met the criteria for mental retardation, her work history indicated that she was actually functioning in the borderline intellectual range. (R. at 147.) Milan ruled out generalized anxiety disorder. (R. at 148.) He found that Hughes was only mildly limited in her activities of daily living, experienced only mild difficulties in maintaining social functioning, experienced moderate difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation in work or work-like settings. (R. at 153.) Milan found that Steward's mental status evaluation was not supported by the medical evidence of record and that his ratings of disability were exaggerated. (R. at 156.)

Milan also completed a mental assessment indicating that Hughes was moderately limited in her ability to understand, remember and carry out detailed job instructions, to work in coordination with or proximity to others without being distracted by them and to complete a normal workday and workweek without interruptions. (R. at 158–59.) In all other areas of adjustment, Hughes was deemed either not significantly limited or there was no evidence of limitation. (R. at 158–59.)

On December 5, 2000, Dr. Michael J. Hartman, M.D., a state agency physician, completed a physical residual functional capacity assessment. (R. at 161–69.) Dr. Hartman found that Hughes could lift and/or carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 162.) He found that Hughes could stand and/or walk for six hours in an eight-hour workday and could sit for six hours in an eight-hour workday. (R. at 162.) Dr. Hartman found that Hughes's ability to push and/or pull was unlimited. (R. at 162.) Dr. Hartman found no other limitations.

On January 16, 2001, x-rays of Hughes's lumbar spine revealed no abnormality. (R. at 171.) An MRI of the lumbar spine revealed a left lateral disc protrusion with mass effect on neural foramina and left nerve root and a central disc protrusion at the L5–S2 level with mild mass effect. (R. at 172.)

Hughes was seen by Dr. Samina Yousuf, M.D., a physician at Community Medical Care on August 6, 2001, with complaints of back pain. (R. at 196.) Hughes refused to see a neurosurgeon. (R. at 196.) She reported having increased anxiety and some underlying depression with difficulty concentrating and fatigue. (R. at 196.) Dr. Yousuf noted that Hughes seemed "somewhat depressed." (R. at 196.) Physical examination revealed moderate back tenderness in the lumbosacral region, mostly on the left, but no paraspinal muscle spasm. (R. at 196.) Hughes's reflexes were diminished in the left lower extremity and knee jerk was 1+. (R. at 196.) Motor strength was 3/5 in the left lower extremity and 4/5 in the right lower extremity. (R. at 196.) Hughes was diagnosed with a herniated disc in her lower back and anxiety disorder. (R. at 196.)

Hughes saw Robert C. Miller, Ed.D., a licensed clinical psychologist, on August 15, 2001, for a psychological evaluation at the request of her attorney. (R. at 197–203.) Hughes stated that her anxiety had increased since seeing psychologist Stew-

ard. (R. at 197.) She stated that she was able to bathe and dress herself, as well as manage her own money and drive short distances. (R. at 198.) She further stated that she washed dishes and swept daily. (R. at 198.) Hughes reported that she did laundry every couple of days. (R. at 198.) She stated that she attended church a couple times per month and attended revivals. (R. at 198.) Hughes's gait and posture were normal. (R. at 198.) Although she reported that she had been written a prescription for a cane, she reported that she did not want to use it. (R. at 198.) Her motor behavior was normal. (R. at 198.) No overt signs of distress were observed during the evaluation. (R. at 198.) Hughes's mood and affect were described as normal but she reported feelings of depression and anxiety. (R. at 198–99.) She was fully oriented with logical and coherent thought processes. (R. at 199.)

Miller administered the WAIS–III test, and Hughes achieved a verbal IQ score of 74, a performance IQ score of 75 and a full-scale IQ score of 72. (R. at 199–200, 206.) These scores placed Hughes in the borderline range of intellectual functioning. (R. at 200, 206.) Miller also administered the Personality Assessment Inventory, ("PAI"), which indicated marked distress and severe impairment of functioning. (R. at 201.) Hughes reported a high level of depressive symptomatology, as well as somatic concerns consistent with chronic pain and health problems. (R. at 201.) Miller opined that Hughes's life was probably severely constricted by her psychological turmoil. (R. at 202.) Miller further opined that Hughes was likely to be plagued by worry that would significantly compromise her ability to concentrate and to attend to tasks. (R.

at 202.) She was diagnosed with major depressive disorder, moderate, recurrent, panic disorder without agoraphobia, social phobia, mild mental retardation by history and a then-current GAF of 45.[5] (R. at 203.)

Miller also completed a mental assessment indicating that Hughes had a good ability to maintain personal appearance, a fair ability to use judgment, to function independently, to understand, remember and carry out simple and detailed job instructions and to demonstrate reliability and a poor or no ability to follow work rules, to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 204–05.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2001). *See also Heckler v. Campbell,* 461 U.S. 458, 460–62, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Hall v. Harris,* 658 F.2d 260, 264–65 (4th Cir.1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2001). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2001).

---

**5.** A GAF of 41–50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM–IV at 32.

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West Supp.2001); *McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir.1983); *Hall*, 658 F.2d at 264–65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir.1980).

By decision dated July 16, 2001, the ALJ denied Hughes's claims. (R. at 15–19.) The ALJ found that Hughes met the disability insured status requirements of the Act on January 6, 1998, and continued to meet them through September 30, 1999, but not thereafter. (R. at 18.) The ALJ also found that Hughes had not engaged in substantial gainful activity since January 6, 1998. (R. at 18.) The ALJ found that the medical evidence established that Hughes had a severe impairment, namely borderline to low average intellect, but he found that Hughes did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ further found that Hughes's subjective allegations were not credible and were not supported by the documentary evidence. (R. at 18.) The ALJ concluded that Hughes retained the residual functional capacity to perform work-related activities except for work involving highly skilled or complex tasks. (R. at 18.) The ALJ found that, because Hughes's past relevant work as an egg packer did not require the performance of highly skilled or complex tasks, she was able to

return to this work. (R. at 19.) Thus, the ALJ found that Hughes was not under a disability as defined by the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) (2001).

In her brief, Hughes argues that substantial evidence does not support the ALJ's finding that she retained the residual functional capacity to perform her past relevant work. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3.) Specifically, Hughes argues that the ALJ erred by finding that she did not have a severe physical impairment. (Plaintiff's Brief at 3–4.) Hughes further argues that the ALJ erred by rejecting the opinion of psychologist Steward. (Plaintiff's Brief at 4–5.) Finally, Hughes argues that the Appeals Council erred by finding that psychologist Miller's evaluation would not have changed the ALJ's decision. (Plaintiff's Brief at 5–6.)

▪ As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir.1997).

Hughes argues that substantial evidence does not support the ALJ's finding that she did not have a severe physical impairment. (Plaintiff's Brief at 3–4.) I

agree. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2001). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, coworkers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2001). The Fourth Circuit held in *Evans v. Heckler,* that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)) (emphasis in original).

■ The uncontradicted medical evidence reveals that Hughes was restricted in her ability to perform work-related physical activities. In particular, Dr. McGuffin, Dr. Johnson and Dr. Hartman, all state agency physicians, found that Hughes was restricted to the performance of medium work. (R. at 122, 162.) The opinions of these three physicians are the only opinions contained in this record with regard to Hughes's physical work-related abilities, and each of these physicians agree that Hughes's physical work-related abilities were limited. That being the case, Hughes's physical condition cannot be classified as nonsevere under the regulations.

■ I must note, however, that I question the judicial economy of remanding this case on the ground set forth above. Although the medical evidence clearly establishes that Hughes has a severe physical impairment restricting her to the performance of no more than medium work, the ALJ specifically found that her past relevant work as an egg packer was light work. (R. at 19, 222.) Nonetheless, under current law, I may not affirm the Commissioner's final decision upon grounds not relied upon by the Commissioner, even if those grounds are supported by the record. In *Securities and Exchange Comm'n v. Chenery Corp.,* the Supreme Court held that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Likewise, courts have held that a reviewing court, in dealing with a judgment that an administrative agency alone is authorized to make, must judge the propriety of the agency's action solely on the grounds invoked by the agency. *See Reynolds v. Apfel,* 1999 WL 509742, *7 (E.D.Pa.1999); *McNeal v. Callahan,* 1998 WL 381692 (N.D.Ill.1998). "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Reynolds,* 1999 WL 509742 at *7; *See McNeal* 1998 WL 381692 at *3 (holding that a court cannot affirm an administrative decision upon grounds other than those relied upon by an ALJ).

Based upon the above-stated reasons, I find that substantial evidence does not support the ALJ's finding that Hughes did not suffer from a severe physical impairment, and I must remand Hughes's claims to the Commissioner for further consideration. That being the case, I will not address Hughes's additional arguments.

### IV. Conclusion

For the foregoing reasons, Hughes's and the Commissioner's motions for summary judgment will be denied, and the case will be remanded to the ALJ for further evaluation of Hughes's physical impairment and its effects on her ability to perform work-related activities.

An appropriate order will be entered.