Newman, Circuit Judge, dissenting.
The court now reverses the PTAB's decision that claims 1-4 and 9-10 of the '290 patent are unpatentable for obviousness, on the court's holding that the PTAB's explanation is inadequate to support its decision.[1] However, if the PTAB's explanation is indeed inadequate, the appropriate appellate action is not to grant final judgment for the opponent. The appropriate action is either (1) to remand for additional explanation, or (2) to decide this question of law. However, the panel majority has neither remanded nor decided the question.
As a further concern, I do not share the view that the PTAB's explanation is deficient. Of course the PTAB must explain its *1378 reasoning, and the America Invents Act places significant responsibility on this agency tribunal, in view of the PTO's announced intention to bring its technological expertise to these new proceedings.[2] Thus the PTAB must well and fully explain the evidentiary foundation and legal reasoning for its decision. In the event that the PTAB's findings or reasoning is deemed inadequate for appellate review, the proper appellate response is not to cement this inadequacy into a final judgment for the opposing party.
From the court's errant rulings, I respectfully dissent.
The PTAB Decision of Unpatentability on the Ground of Obviousness is Adequately Explained
At the trial the parties agreed that only a single claim clause is at issue; DSS conceded that all other claim limitations are shown in the prior art. Thus the only question before the PTAB was whether it would have been obvious in view of the Natarajan reference that "said server and peripheral transmitters be[ ] energized in low duty cycle RF bursts." '290 patent, claim 1 (final clause).
The PTAB decision recited the parties' arguments, described the Natarajan reference and the secondary reference to Neve, and explained why the PTAB agreed with the positions presented by Apple as applied to the claims and the references. Apple I at *8-16. My colleagues' criticism is that the PTAB repeats the parties' presentation concerning the '290 patent and the references, and generally endorses Apple's arguments concerning obviousness. Maj. Op. at 1382-84. Indeed, the PTAB's opinion states the arguments presented by each side. But the PTAB also states with reasonable clarity how this information contributed to the conclusion of obviousness, with focus on those aspects that controlled the decision.
This form of analysis can be useful, when the presentation of the arguments and surrounding information is adequate to show the foundation and reasoning of the decision. In Outdry Technologies Corp. v. Geox S.p.A. , 859 F.3d 1364, 1370 (Fed. Cir. 2017) this court stated: "The Board is permitted to credit a party's argument as part of its reasoned explanation of its factual findings; it simply must explain why it accepts the prevailing argument." (quoting Icon Health & Fitness, Inc. v. Strava, Inc. , 849 F.3d 1034, 1047 (Fed. Cir. 2017) ) (internal quotation marks omitted). In Paice LLC v. Ford Motor Co. , 881 F.3d 894 (Fed. Cir. 2018), the court responded to a similar criticism, observing that in rejecting some arguments and accepting others, "the Board's decisions here cite to the relevant portions of Ford's briefing that explain how the prior art discloses the relevant claim limitations." Id. at 905. That the PTAB framed its analysis in terms of the parties' arguments and evidence does not render its decision-making de facto inadequate. The concern is not to condone an apparent shortcut in adjudicatory analysis, but to assure that the PTAB "engaged in reasoned decision-making and sufficiently articulated its analysis" to explain its support in fact and law. Outdry , 859 F.3d at 1370.
*1379 Here, the PTAB's reasons are sufficiently articulated, as I shall discuss post . To be sure, there have been occasions when the PTAB has failed to adequately explain its findings or conclusions, seen in cases collected in Outdry, supra, where "[m]issing from those Board decisions were citations to the evidence, reasoned explanations, or explicit findings necessary for us to review for substantial evidence." Id . at 1369. Here, however, necessary findings are not missing from the PTAB's decision.
The PTAB recited, and it is not disputed, that "energized in low duty cycle RF bursts" means "energized, in short periods of intense RF transmission activity on an otherwise quiet data channel, only to the extent required to satisfy the data transmission needs over the course of a communication cycle." Apple I at *7. The PTAB understood that this construction is satisfied when
a transmitter is not energized continuously over the course of network operation, but is depowered during at least two time periods of each communication cycle: first, in time slots in which the unit that includes the transmitter is assigned to receive data; and second, in time slots, if any, when the unit is assigned to transmit data but has no data to transmit.
Apple I at *7.
The PTAB was persuaded by each of Apple's arguments concerning the disputed limitation, and "conclude[d] that it would have been obvious to a person of ordinary skill in the art to energize Natarajan's server transmitter in low duty cycle RF bursts, as recited in claim 1." Apple I at *15. The PTAB acknowledged, and adopted, Apple's cited evidence and expert's views in its obviousness determination. See Apple I at *16 ("As explained above, we find, based on Apple's evidence, that the combination of Natarajan and Neve teaches each limitation of claim 1."). Substantial evidence is cited and explained in the PTAB opinion, in support of the PTAB's conclusion.
For example, the PTAB explained in its opinion that Natarajan teaches conserving battery power, stating:
The scheduled access multiaccess protocol is implemented to effectively conserve battery power by suitable control of the state of the controller, the transmitter and receiver units at the wireless link adapter by scheduling when the adapter is in a normal running mode, or a standby mode in which power is conserved.
Apple I at *8 (quoting Natarajan at Abstract; also citing col. 3, l. 66-col. 4, l. 1). The PTAB explained that Natarajan discloses that "[a] desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." Id . (quoting Natarajan at col. 4, ll. 3-6).
The PTAB found it "uncontested" that Natarajan discloses "peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence." Apple I at *11. DSS does not dispute this explanation, or the extent of uncontested facts.
The PTAB also explained Natarajan's teachings, stating that:
Natarajan discloses that the base station broadcasts a header that includes a list of mobile users that will be receiving data packets from the base station in the current frame, the order in which the mobile users will receive the data packets, *1380 and the bandwidth allocated to each user. Id . at *9 (citing Natarajan at col. 4, ll. 45-53). Accordingly, "a mobile unit that is not included in the header from the base station can turn its receiver 'OFF' for the duration of the current subframe." Id . (citing Natarajan at col. 4, ll. 64-67). The PTAB further observed, in explaining its findings, that
the adapter of each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station by adding up the slots allocated to all receiving units that precede it, power 'ON' during that time slot to receive its data, and go back to sleep for the remainder of the subframe.
Id . (citing Natarajan at col. 4, l. 67-col. 5, l. 6).
With respect to communications from the mobile units to the base station, the PTAB explained that:
Natarajan similarly discloses that the base station broadcasts a header that includes an ordered list of users that will be allowed to transmit packets to the base station in the current frame and the bandwidth allocated to each.
Id . (citing Natarajan at col. 5, ll. 9-19). The PTAB found that each mobile unit can use the information broadcast in the header to compute exactly when the mobile unit should transmit to the base station, shutting down both the transmitter and receiver of the mobile units when not in use. Id . (citing Natarajan at col. 5, ll. 23-29).
The PTAB's written decision also recited the DSS argument that Natarajan's base unit's transmitter "encapsulate data and control information in an HDLC (highlevel data link control) packet structure and provide the packet in serial form to the RF transceiver 54;" DSS stated that "HDLC involves continuous transmissions in which special bit sequences-i.e. idle words-are transmitted when no data transmission is required." Apple I at *12 (quoting DSS Patent Owner Response at 20-21).
The PTAB summarized the DSS arguments that "[t]he HDLC packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts" and "[i]t is well-known in the art that HDLC is an example of a bit-oriented framing that involves a continuous outbound transmission rather than operation in low duty cycle RF bursts." Apple I at *12 (quoting DSS Patent Owner Response at 20). However, the PTAB found that Apple persuasively refuted these arguments, referring to Apple's explanation that Natarajan's HDLC protocol was actually consistent with low duty cycle RF bursts, and pointed out that the preferred embodiment of the '290 patent utilized the HDLC protocol. Apple I at *13-14.
Apple also explained that a reference cited by Natarajan in discussing the HDLC protocol, Mischa Schwartz, Telecommunication Networks: Protocols, Modeling and Analysis, Addison-Wesley (1988) ("Schwartz") supports the conclusion that Natarajan's HDLC protocol is consistent with both low duty cycle communication and RF transmissions occurring in bursts. Apple I at *14.
The PTAB referred to Schwartz's explanation that "[w]hen the transmitter reaches its maximum sequence number it is forced to stop transmitting until a frame in the reverse direction is received, acknowledging an out-standing packet." Apple I at *14. The PTAB also referred to Apple's citation of Figure 4-13, which showed the HDLC protocol having the transmitter idle between frames. Id .
*1381 The PTAB discussed this evidence in the bigger picture of applying a low duty cycle to Natarajan's base unit's transmitter. "Apple argue[d] that a person of ordinary skill in the art would have understood from Natarajan that, when Natarajan's base station is not transmitting, its transmitter is powered off." Apple I at *13. This point was uncontested, for DSS conceded that Natarajan's base unit transmitter would be powered down when not transmitting. J.A.409 (Patent Owner Response at 22 n.3) ("Patent Owner acknowledges that the operation of the base transmitter is not continuous over the entire frame because the base transmitter is powered down during inbound traffic in Period B."). Hence, the parties (and the PTAB) focused on the power and transmission status of Natarajan's base unit transmitter during Period A.
The PTAB's finding that it would have been obvious for "said server and peripheral transmitters being energized in low duty cycle RF bursts" was buttressed by Natarajan's explanation that "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications. This is primarily due to the bursty nature of data communication traffic." Natarajan at col. 6, ll. 41-44. The PTAB cited this passage in its discussion of Apple's argument that "a person of ordinary skill in the art would have understood from Natarajan that, when Natarajan's base station is not transmitting, its transmitter is powered off." Apple I at *13.
The PTAB also cited the declaration of Apple's expert, Dr. Hu, which discussed this passage and relied upon it to opine that "the base station will not have information to transmit most of the time," and concluded that this met the "low duty cycle RF bursts" limitation because "when it is not transmitting, it will be powered off." Id . (citing J.A.1994 (Declaration of Dr. Hu) ).[3] Likewise, the PTAB cited the cross-examination of Apple's expert, Dr. Grimes, who explained that during Natarajan's Period A, the base unit transmitter "only transmits during those periods when there's a receiver that's allocated to receive the information" and that "the transmitter is off when it's not transmitting." Id . (citing Deposition of Dr. Grimes at 68:5-7, 75:21-22).
The panel majority does not discuss or review the evidence cited by the PTAB in its decision. This evidence well supports the PTAB's conclusion that "Natarajan's disclosure of the HDLC protocol is consistent with Natarajan's base units being energized in low duty cycle RF bursts, as that term is properly construed." Apple I at *15. To teach the limitation at issue, Natarajan need only have taught a base unit wherein the "transmitter is not energized continuously over the course of network operation, but is depowered during at least two time periods of each communication cycle: first, in time slots in which the unit that includes the transmitter is assigned to receive data; and second, in time slots, if any, when the unit is assigned to transmit data but has no data to transmit." See Apple I at *7.[4]
DSS conceded at the PTAB that during Period B, Natarajan's base unit transmitter *1382 would be powered down. DSS has maintained this position on appeal. DSS Br. at 25 ("[D]uring Period B, the base unit transmitter is not energized at all-in bursts or otherwise-at any time outside of Header BH."). This meets the first time period for depowering referred to in the PTAB's construction.
Natarajan's teachings about the "Receive-Inactive" status of most mobile units most of the time during Period A, particularly as explained by Apple's expert witnesses, meets the second time period for depowering referred to in the PTAB's construction. Accepting that the technology is complex, as my colleagues state, this court held in Ariosa Diagnostics v. Verinata Health, Inc. , 805 F.3d 1359, 1365 (Fed. Cir. 2015), that "[w]e may affirm an agency ruling if we may reasonably discern that it followed a proper path, even if that path is less than perfectly clear." The PTAB followed an appropriate, discernable pathway to reach its conclusion that the challenged claims would have been obvious. Again, the panel majority does not discuss or critically consider the evidence cited by the PTAB in its decision.
The principle established in Chenery requires that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." SEC v. Chenery Corp. , 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ; see also Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[A]n agency must explain its action with sufficient clarity to permit 'effective judicial review.' "); Mullins v. U.S. Dep't of Energy , 50 F.3d 990, 992 (Fed. Cir. 1995) ("[A]gencies have a duty to provide reviewing courts with a sufficient explanation for their decisions so that those decisions may be judged against the relevant statutory standards ....").
The PTAB in its decision explained the meaning of the disputed limitation in the context of the teachings of Natarajan, and presented an analysis with the evidence that supported its conclusion. The requirements of Chenery were met. In stating that this court "cannot" itself decide the question of obviousness based on Natarajan, my colleagues state that "a more reasoned explanation than that provided by the PTAB can[not] be gleaned from the record." That statement is not in accord with the PTAB's decision, for the record is heavy with testimony, briefing, and argument, presented by the Petitioner Apple *1383 and the Patent Owner DSS, and the PTAB's decision cites and explains the resources on which it reached its conclusion, presenting the arguments and evidence on both sides, and explaining its conclusion. The factual findings that underlie that conclusion are supported by substantial evidence, and the PTAB's decision of obviousness is fully supported, and should be sustained.
Reversal is not a Remedy for Inadequate Explanation
If the PTAB's analysis were indeed deficient, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion , 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "[W]hen the [PTAB]'s action is potentially lawful but insufficiently or inappropriately explained, we have consistently vacated and remanded for further proceedings." In re Van Os , 844 F.3d 1359, 1362 (Fed. Cir. 2017) (internal quotation marks omitted) (collecting cases). Deficient adjudication is not grounds for a decision on the merits. On the majority's theory that the PTAB's explanation was inadequate, the appropriate remedy is to return the matter to the PTAB for better explanation, on any of the reasons compiled in Outdry . The court errs in simply reversing the PTAB's decision.
My colleagues also criticize the PTAB's understanding of the prior art, stating that "the Board failed to consider that Natarajan's multi-access protocol imposes different transmission requirements on the base station and the mobile units." Maj. Op. at 1376. However, the majority limits its examination of Natarajan to only a portion of its disclosure-Period A. Id . Neither Apple nor the PTAB restricted Natarajan's disclosure to this Period. See, e.g. , PTAB Op. at *11 (citing Natarajan's discussions of Period B).
By ignoring Period B, as well as the base unit transmission of header BH, the majority overlooks the segment of Natarajan's cycle in which the base unit transmitter transmits, goes quiet and, as DSS admitted both before the PTAB and on appeal, would be powered down. J.A.409 (Patent Owner Response at 22 n.3); DSS Br. at 25 ("[D]uring Period B, the base unit transmitter is not energized at all-in bursts or otherwise-at any time outside of Header BH.").
Moreover, the transmission requirements of the mobile units and the base units are intertwined, for the mobile units and the base unit are in direct communication with each other through transmission and reception in Natarajan's scheduled multi-access protocol. See, e.g. , J.A.2331-32 (Deposition of Dr. Grimes). Natarajan explains that "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications. This is primarily due to the bursty nature of data communication traffic." Natarajan at col. 6, ll. 41-44. Accordingly, "Receive-Inactive" mobile units suggest a "Transmit-Inactive" base unit. See, e.g. , J.A.1993-95 (Declaration of Dr. Hu).
The majority faults the PTAB for failing to discuss "whether, if the base station transmitter in Natarajan were modified, its transmissions would be characterized by 'short periods of intense RF transmission activity on an otherwise quiet data channel ,' as required by the Board's own claim construction." Maj. Op. at 1376. However, the evidence is that this is the natural result of Natarajan's communication protocol. Apple's expert witnesses sufficiently explained that if Natarajan's *1384 mobile units are likely to be "Receive-Inactive" most of the time, Natarajan's base unit transmitter would operate by transmitting during header AH, followed by very little or no transmission during Period A, then transmission during header BH, followed by no transmission during Period B. See J.A.1993-95, 2013-15 (Declaration of Dr. Hu); J.A.2331-32 (Deposition of Dr. Grimes); Apple I , Exhibit 1008 at ¶¶ 115, 116 (Declaration of Dr. Grimes).
This explanation and evidence meet the claim limitation that is in dispute. See Apple I at *7 (" '[E]nergized in low duty cycle RF bursts' simply means that a transmitter is not energized continuously over the course of network operation, but is depowered during at least two time periods of each communication cycle: first, in time slots in which the unit that includes the transmitter is assigned to receive data; and second, in time slots, if any, when the unit is assigned to transmit data but has no data to transmit.").
My colleagues do not mention this analysis, which also meets the alternative formulation of the claim limitation, namely "energized, in short periods of intense RF transmission activity on an otherwise quiet data channel, only to the extent required to satisfy the data transmission needs over the course of a communication cycle." Id . Natarajan's base unit would be "Transmit-Inactive" most of the time, for the transmission of headers AH and BH are taught to "represent a small fraction of the whole frame length." Natarajan at col. 6, ll. 39-47. With no need to send transmissions to mobile units, the base unit transmitter would be powered down to reduce power consumption when not transmitting, in accordance with the unchallenged motivation that the PTAB expressly found. The PTAB explained in Apple I at *15 :
We are persuaded that a person of ordinary skill in the art would have been motivated by Natarajan to apply the same power-conserving techniques to base units as it is disclosed with respect to mobile units ....
Apple's experts provided a sufficient predicate for the PTAB to find that this would afford short periods of intense RF transmissions by Natarajan's base unit transmitter on an otherwise quiet data channel. Compare Declaration of Dr. Hu at ¶¶ 42-45 (J.A.1992-95) with ¶¶ 85-88 (J.A.2015-17); Apple I , Exhibit 1008 at ¶¶ 115, 116 (Declaration of Dr. Grimes).
The PTAB explained its decision in accordance with the evidence and the prior art, as presented by the parties and as analyzed by the PTAB, to support the conclusion that Natarajan's base unit's transmitter would have operated, or it would have been obvious to operate, by "short periods of intense RF transmission activity on an otherwise quiet data channel," the construed words of the claim.
The appellate role, on review of the agency decision, includes "determin[ing] whether it is arbitrary or capricious, or, if bound up with a record-based factual conclusion, to determine whether it is supported by substantial evidence." Dickinson v. Zurko , 527 U.S. 150, 164, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (internal quotation marks omitted). If the agency's presentation is inadequate to demonstrate its reasoning, the appropriate remedy is not to issue a final judgment on appeal. See Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG , 856 F.3d 1019, 1026 (Fed. Cir. 2017) ("The Board has not provided a sufficiently focused identification of the relevant evidence or explanation of its inferences for us to confidently review its decision and avoid usurping its fact-finding *1385 authority. Accordingly, as we have concluded in similar circumstances, these deficiencies call for a vacatur and remand for further explanation from the Board.") (citation omitted) (collecting cases); see also Van Os , 844 F.3d at 1362 ; Personal Web Techs., LLC v. Apple, Inc. , 848 F.3d 987, 994 (Fed. Cir. 2017) ; In re NuVasive, Inc. , 842 F.3d 1376, 1385 (Fed. Cir. 2016) ; Power Integrations, Inc. v. Lee , 797 F.3d 1318, 1325 (Fed. Cir. 2015) ; In re Sang-Su Lee , 277 F.3d 1338, 1346 (Fed. Cir. 2002).
The Court has so held, see F.T.C. v. Sperry & Hutchinson Co. , 405 U.S. 233, 250, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) ("[T]he preferable course would have been to remand the case to the Commission for further proceedings."); Fed. Power Comm'n v. United Gas Pipe Line Co. , 393 U.S. 71, 73, 89 S.Ct. 55, 21 L.Ed.2d 55 (1968) ; SEC v. Chenery Corp. , 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
My colleagues' action in simply reversing the ruling of the PTAB, producing a final judgment of patentability that is purportedly subject to estoppel in any district court proceeding between these parties, is contrary to the body of precedent, and dilutes the purpose of these post-grant proceedings. I respectfully dissent from this ruling.

Apple Inc. v. DSS Tech. Mgmt., Inc. , No. IPR2015-00369, 2016 WL 3382361 (P.T.A.B. June 17, 2016) (Apple I ); Apple Inc. v. DSS Tech. Mgmt., Inc. , No. IPR2015-00373, 2016 WL 3382464 (P.T.A.B. June 17, 2016) (Apple II ). The rulings are substantially identical, and I cite only to Apple I .

See Patent Reform: The Future of American Innovation: Hearing Before the S. Comm. on the Judiciary , 110th Cong. 7 (2007), Director Jon W. Dudas:
The idea was that this could serve as a meaningful alternative to litigation, probably less costly, certainly before experts at the Patent and Trademark Office.

The panel majority characterizes Dr. Hu's testimony, and the PTAB's citation to ¶¶ 44-45 of Dr. Hu's declaration, as "conclusory" and "unspecific." Maj. Op. at 1384. However, in the context of the PTAB's construction of the disputed limitation, Apple I at *7, the testimony is directly on the point for which it was cited.

The panel majority argues that I read too much into this sentence, and that if "[t]aken out of context, this passage contradicts the Board's own explicit claim construction." Maj. Op. at 1376-77 n.5. I agree that we should read statements in PTAB decisions in their proper context, including statements concerning the parties' arguments, cited evidence, and what was found to be persuasive. I also agree that we should interpret the PTAB's statements correctly. The majority's example, in its n.5, illustrates this point. A hypothetical transmitter that continuously transmits data and is never assigned to receive data could not satisfy the minimum two time period depowering requirement explicitly referred to in the PTAB's explanation of the meaning of "energized in low duty cycle RF bursts" and quoted by the majority. First, such a transmitter could not be depowered "in time slots in which the unit that includes the transmitter is assigned to receive data," per the PTAB's explanation, for no such time slots exist as the majority's transmitter "is never assigned to receive data." Second, such a transmitter could not be depowered "in time slots, if any, when the unit is assigned to transmit data but has no data to transmit," per the PTAB's explanation, for the majority's transmitter "is continuously transmitting data" and "always has data to transmit." The majority reaches the wrong conclusion from its hypothetical, for its transmitter is not "depowered during at least two time periods of each communication cycle," as the PTAB's explanation requires.